1  ROBERT P. VARIAN (SBN 107459)
   *Email: rvarian@orrick.com*
2  JAMES N. KRAMER (SBN 154709)
   *Email: jkramer@orrick.com*
3  ALEXANDER K. TALARIDES (SBN 268068)
   *Email: atalarides@orrick.com*
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
5  405 Howard Street
   San Francisco, CA  94105-2669
6  Telephone:    (415) 773-5700
   Facsimile:    (415) 773-5759
7
   Attorneys for Defendants Electronic Arts Inc., Andrew Wilson,
8  Lawrence F. Probst III, Blake J. Jorgensen, Peter Robert Moore,
   Frank D. Gibeau, and Patrick Söderlund
9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14

| | |
|---|---|
| In re ELECTRONIC ARTS, INC. SECURITIES LITIGATION | Master File No. 3:13-cv-05837-SI |
| | **CLASS ACTION** |
| This Document Relates To: | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| ALL ACTIONS | Date:       August 29, 2014<br>Time:       9:00 a.m.<br>Judge:      Honorable Susan Illston<br>Courtroom:  10, 19th Floor |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

FACTUAL OVERVIEW ................................................................................................ 3

ARGUMENT .................................................................................................................. 7

I.    The Alleged Misstatements Are Inactionable As A Matter Of Law...................... 8

    A.    Most Of The Alleged Misstatements Are Inactionable As A Matter Of Law Because They Post-Date Plaintiffs' Purchases ............................ 8

    B.    All Of The Alleged Inactionable Because They Are Vague Statements Of Opinion, Corporate Optimism, And "Puffery" ............................................................... 9

II.    The Complaint Fails To Allege Falsity ................................................................ 12

    A.    Most Of The Alleged Misstatements Did Not Refer To BF4 ................... 13

    B.    The Alleged Misstatements Did Not Promise A Problem-Free Launch ....................................................................................................... 13

    C.    The Alleged Misstatements Were Justified When Made And Borne Out By Subsequent Events.................................................................... 14

    D.    The Complaint Does Not Allege Facts Sufficient To Show That Any Alleged Misstatement Was False When Made ................................ 15

III.    The Complaint Fails to Create A Strong Inference Of Scienter ......................... 17

    A.    The Complaint Lacks The Specificity And Corroboration Required To Plead Scienter ................................................................................... 17

    B.    The "Core Operations" Presumption Does Not Create A Strong Inference of Scienter, Especially Under The Facts Of This Case............ 20

    C.    Plaintiffs' Allegations Of Inadequate Testing Protocols Do Not Plead Fraud ........................................................................................... 22

    D.    The Complaint Fails To Satisfy The Requirements Established In Tellabs ....................................................................................................... 22

        1.    The Complaint Lacks A Cogent And Compelling Theory of Fraud ............................................................................................... 23

        2.    The Complaints' Fatal Deficiencies Are Underscored By Tellabs' Weighing Analysis........................................................... 23

    E.    Defendants' Stock Sales Do Not Provide A Strong Inference Of Scienter....................................................................................................... 24

CONCLUSION ............................................................................................................. 28

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Accuray, Inc. Sec. Litig.*,
   757 F. Supp. 2d 936 (N.D. Cal. 2010) ...................................................................26

*In re Apple Computer, Inc. Sec. Litig.*,
   127 F. App'x 296 (9th Cir. 2005) ..............................................................10, 17

*In re Apple Computer, Inc. Sec. Litig.*,
   2003 WL 26111982 (N.D. Cal. Aug. 13, 2003), *aff'd*, 127 F. App'x 296 (9th
   Cir. 2005) ..............................................................................................19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................7

*In re Boston Tech., Inc. Sec. Litig.*,
   8 F. Supp. 2d 43 (D. Mass. 1998) ...........................................................10, 13

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
   2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ...........................................12

*Brodsky v. Yahoo! Inc.*,
   592 F. Supp. 2d 1192 (N.D. Cal. 2008) ...................................................10, 26

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)...................................................................24

*In re Century Aluminum Co. Sec. Litig.*,
   749 F. Supp. 2d 964 (N.D. Cal. 2010) .....................................................21

*In re Cisco Sys. Inc. Sec. Litig.*,
   2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)..........................................11

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) ...........................................26

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005)...................................................................9

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ...................................................10

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) .....................................................10

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
   355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...................................................................9

*In re Craftmatic Sec. Litig.*,
   890 F.2d 628 (3d Cir. 1989)...................................................................................22

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010)..................................................................................9

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010)....................................................................................7

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) .................................................................................................7

*In re Federated Dept. Stores, Inc. Sec. Litig.*,
   2004 WL 444559 (S.D.N.Y. Mar. 11, 2004) ........................................................21

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004)..................................................................................10

*Frazier v. VitalWorks, Inc.*,
   341 F. Supp. 2d 142 (D. Conn. 2004) ................................................10, 14, 17, 19

*In re FVC.com Sec. Litig.*,
   136 F. Supp. 2d 1031 (N.D. Cal. 2000) ...........................................................27, 28

*Gammel v. Hewlett-Packard Co.*,
   905 F. Supp. 2d 1052 (C.D. Cal. 2012)................................................10, 13, 19, 20

*Gaylinn v. 3Com Corp.*,
   185 F. Supp. 2d 1054 (N.D. Cal. 2000) ................................................................28

*In re Gilat Satellite Networks, Ltd.*,
   2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005)......................................................19

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003)..................................................................................11

*In re GlenFed, Inc. Sec. Litig.*,
   11 F.3d 843 (9th Cir. 1993), *vacated on other grounds*, 42 F.3d 1541 (9th Cir.
   1994) .......................................................................................................................22

*Gompper v. VISX, Inc.*,
   298 F.3d 893 (9th Cir. 2002)....................................................................................8

*Greenberg v. Crossroads Sys., Inc.*,
   364 F.3d 657 (5th Cir. 2004)..................................................................................13

*Gross v. Summa Four, Inc.*,
93 F.3d 987 (1st Cir. 1996) ...................................................................................9

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ................................................................................9

*In re Hansen Nat. Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..............................................................27

*In re Immersion Corp. Sec. Litig.*,
2011 WL 871650 (N.D. Cal. Mar. 11, 2011) ......................................................28

*In re IMPAX Labs. Sec. Litig.*,
2006 WL 6361942 (N.D. Cal. Mar. 1, 2006) ......................................................26

*Jackson v. Fischer*,
931 F. Supp. 2d 1049 (N.D. Cal. 2013) ................................................................8

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
131 S. Ct. 2296 (2011) ..........................................................................................8

*Klein v. Gen. Nutrition Cos., Inc.*,
186 F.3d 338 (3d Cir. 1999) ..................................................................................8

*Levine v. NL Indus., Inc.*,
720 F. Supp. 305 (S.D.N.Y. 1989), *aff'd*, 926 F.2d 199 (2d Cir. 1991) ...............8

*In re Lexar Media, Inc. Sec. Litig.*,
2005 WL 1566534 (N.D. Cal. July 5, 2005) .......................................................28

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) .............................................................................25

*In re Lululemon Sec. Litig.*,
--- F. Supp. 2d ---, 2014 WL 1569500 (S.D.N.Y. Apr. 18, 2014) .........................22

*McCasland v. FormFactor Inc. (FormFactor I)*,
2008 WL 2951275 (N.D. Cal. July 25, 2008) ..........................................17, 19, 25

*McCasland v. FormFactor Inc. (FormFactor II)*,
2009 WL 2086168 (N.D. Cal. July 14, 2009) ...............................................18, 22

*In re Metricom Sec. Litig.*,
2004 WL 966291 (N.D. Cal. Apr. 29, 2004) .......................................................12

*Metzler Inv. GMBH v. Corinthian Coll., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...................................................................... *passim*

*In re Midway Games, Inc. Sec. Litig.*,
   332 F. Supp. 2d 1152 (N.D. Ill. 2004) ............................................................................10, 11

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000) ........................................................................................10

*In re Netopia, Inc. Sec. Litig.*,
   2005 WL 3445631 (N.D. Cal. Dec. 15, 2005) ............................................................................26

*In re NVE Corp. Sec. Litig.*,
   551 F. Supp. 2d 871 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008) ............................10

*In re NVIDIA Corp. Sec. Litig.*,
   2011 WL 4831192 (N.D. Cal. Oct. 12, 2011) ............................................................................21

*Orton v. Parametric Tech. Corp.*,
   344 F. Supp. 2d 290 (D. Mass. 2004) ........................................................................................11

*Osher v. JNI Corp.*,
   302 F. Supp. 2d 1145 (S.D. Cal. 2003) ......................................................................................25

*Osher v. JNI Corp.*,
   308 F. Supp. 2d 1168 (S.D. Cal. 2004), *aff'd in relevant part*, 184 F. App'x
   604 (9th Cir. 2006)......................................................................................................................26

*In re PetSmart, Inc. Sec. Litig.*,
   61 F. Supp. 2d 982 (D. Ariz. 1999)............................................................................................27

*Plevy v. Haggerty*,
   38 F. Supp. 2d 816 (C.D. Cal. 1998) .........................................................................................12

*In re Rackable Sys., Inc. Sec. Litig.*,
   2010 WL 1997703 (N.D. Cal. Jan. 13, 2010) ...........................................................................28

*In re Read-Rite Corp. Sec. Litig.*,
   2004 WL 2125883 (N.D. Cal. Sept. 22, 2004) ..........................................................................16

*In re Read-Rite Corp. Sec. Litig.*,
   335 F.3d 843 (9th Cir. 2003)................................................................................................18, 20

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
   2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...............................................................................11

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
   963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................................................15

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
   865 F. Supp. 2d 811 (W.D. Mich. 2012) ...................................................................................11

*Rochester Laborers Pension Fund v. Monsanto Co.*,
 883 F. Supp. 2d 835 (E.D. Mo. 2012) .................................................................................12

*Ronconi v. Larkin*,
 253 F.3d 423 (9th Cir. 2001) ...............................................................................................24

*Roots P'ship v. Lands' End, Inc.*,
 965 F.2d 1411 (7th Cir. 1992) ................................................................................................8

*Rudolph v. UTStarcom*,
 560 F. Supp. 2d 880 (N.D. Cal. 2008) ............................................................................17, 28

*S. Ferry LP, #2 v. Killinger*,
 542 F.3d 776 (9th Cir. 2008) ...............................................................................................21

*Schuster v. Symmetricon, Inc.*,
 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ....................................................................13

*Shemian v. Research In Motion Ltd.*,
 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ....................................................................12

*Shields v. Citytrust Bancorp, Inc.*,
 25 F.3d 1124 (2d Cir. 1994) ...........................................................................................12, 23

*In re Siebel Sys., Sec. Litig.*,
 2005 WL 3555718 (N.D. Cal. Dec. 28, 2005), *aff'd*, 261 F. App'x 60 (9th Cir.
 2007) ...............................................................................................................................14, 18

*In re Silicon Graphics, Inc. Sec. Litig.*,
 183 F.3d 970 (9th Cir. 1999) .......................................................................................*passim*

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
 2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ..........................................................................9

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
 365 F.3d 353 (5th Cir. 2004) ................................................................................................19

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
 160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...............................................................................12

*Stickrath v. Globalstar, Inc.*,
 527 F. Supp. 2d 992 (N.D. Cal. 2007) .................................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ....................................................................................................*passim*

*In re Tibco Software, Inc. Sec. Litig.*,
 2006 WL 1469654 (N.D. Cal. May 25, 2006) ...............................................................26, 27

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011) ...................................................................................21

*Van Ormer v. Aspen Tech., Inc.*,
    145 F. Supp. 2d 101 (D. Mass. 2000) ...................................................................................22

*In re Vantive Corp. Sec. Litig.*,
    110 F. Supp. 2d 1209 (N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002)..................25, 26

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002)...........................................................................17, 26, 27, 28

*In re Verifone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993)..................................14

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ...................................................................................24

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007)................................................................................................8

*Wollrab v. Siebel Sys., Inc.*,
    261 F. App'x 60 (9th Cir. 2007) .........................................................................................20

*Wozniak v. Align Tech., Inc.*,
    2011 WL 2269418 (N.D. Cal. June 8, 2011) ...................................................................11, 28

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ...............................................................................10

*Yourish v. Cal. Amplifier*,
    191 F.3d 983 (9th Cir. 1999)..........................................................................................15, 20

*Zerger v. Midway Games, Inc.*,
    2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)..........................................................................20

*Zouras v. Hallman*,
    2004 WL 2191034 (D.N.H. Sept. 30, 2004) ..........................................................................13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)..........................................................................................21, 26

**STATUTES**

15 U.S.C.
  § 78u-4(b)(1) ................................................................................................................7, 13
  § 78u-4(b)(2) ................................................................................................................7, 17

**RULES**

Federal Rules of Civil Procedure
  Rule 12(b)(6) ....................................................................................................................7

Securities and Exchamge Commission Rules
  Rule 10b-5 ....................................................................................................................8, 9

1

### **INTRODUCTION**

2      *Battlefield 4* ("*BF4*") is a popular and commercially successful video game published by

3 Defendant Electronic Arts Inc. ("EA").  When EA released *BF4* in the fall of 2013, some players

4 experienced technical problems related to its groundbreaking online multiplayer features.  The

5 problems were quickly addressed by EA and *BF4* has since sold millions of copies and become

6 one of the best-selling games in the industry.

7      This lawsuit is an attempt to parlay *BF4*'s technical issues into a securities fraud class

8 action, but courts have repeatedly held that unforeseen technical problems are inadequate to

9 support a securities fraud claim.  The allegations in this case produce the same result for at least

10 three independent reasons.

11      *First*, the Complaint is based on alleged misstatements that are inactionable as a matter of

12 law.  The statements challenged by Plaintiffs are the type of vague statements of optimism,

13 puffery, and opinion that courts have repeatedly found incapable of supporting a claim under the

14 federal securities laws.  Moreover, six of the nine alleged misstatements are inactionable as a

15 matter of law because they were made *after* Plaintiffs purchased their EA stock.

16      *Second*, the Complaint fails to allege falsity.  With one minor exception, the alleged

17 misstatements do not even mention *BF4*.  That is not surprising.  *BF4* is but one product in an

18 extensive EA product line and, contrary to the impression conveyed in the Complaint, the game

19 does not constitute the core of EA's operations.  Notwithstanding that disconnect, the statements

20 challenged by Plaintiffs cannot support the element of falsity because (1) they lack the

21 substantive content necessary to label them false, (2) they were justified at the time they were

22 made, (3) they were borne out by subsequent events, and, in any event, (4) Plaintiffs have failed

23 to allege any contemporaneous, particularized facts showing that any statement was false or

24 misleading *when made*.

25      *Third*, the Complaint does not plead the requisite strong inference of scienter.  The

26 Complaint is devoid of allegations indicating that any Defendant believed or suspected that any

27 statement was incorrect.  The Complaint contains no "confidential witness" allegations, nor any

28 references to any internal report, document, meeting, or discussion supporting any inference of

MEMO OF  POINTS & AUTHORITIES IN SUPPORT
OF DEFENDANTS' MTD - (MASTER FILE NO. 3:13-
CV-05837-SI)

1    scienter.  The Complaint thus has none of the specificity, corroboration, or detail necessary to

2    show a strong inference of fraudulent intent.

3          Furthermore, the Complaint lacks all the hallmarks of a typical securities fraud action.

4    There has been no financial restatement, no auditor resignation, no regulatory investigation, no

5    SEC enforcement action, no whistleblower, no stock offering or merger transaction in which EA

6    was using its stock as currency, and no product liability or consumer litigation concerning *BF4*.

7          Indeed, the theory of fraud advanced in the Complaint is fundamentally irrational, and

8    thus cannot support the cogent and compelling inference of scienter required by *Tellabs, Inc. v.*

9    *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  According to the Complaint, Defendants

10   launched an important product into a highly competitive marketplace despite knowing or

11   suspecting that it had "game-breaking" defects, and compounded the injury by deliberately

12   making false statements that would further harm the product's success and their own credibility.

13   That inference is not even reasonable—much less cogent and compelling—particularly given the

14   complete absence of particularized facts that might support the notion that such irrational

15   behavior actually occurred.

16         Similarly, under the "weighing" analysis prescribed by *Tellabs*, any possible inference of

17   fraud would be overwhelmed by non-culpable inferences and explanations, including that EA's

18   executives were unaware of significant technical problems prior to *BF4*'s release, and that

19   unforeseen technical challenges are common in the launch of highly complex and groundbreaking

20   software products.  Moreover, the documents quoted and cited in the Complaint show that even

21   the game developers who worked on *BF4* were unaware of significant technical problems prior to

22   *BF4*'s launch.  It is thus inconceivable that EA's senior executives would have been aware of

23   such problems.  The documents quoted and cited in the Complaint also show that *BF4* underwent

24   extensive pre-launch testing and received multiple pre-launch awards and accolades, which

25   indicated the *absence* of significant technical problems.

26         For each of these reasons, the Complaint does not come close to alleging a viable claim

27   for securities fraud.  It should therefore be dismissed.

28

1

**FACTUAL OVERVIEW**

2      EA has been a leader in the video game industry since its founding in 1982.  EA develops

3  and publishes a wide variety of video games and related services for game consoles, personal

4  computers, tablets, mobile phones and the Internet, and is recognized for innovation and

5  creativity.  Ex. PP at 3-6.[1]

6      Contrary to the impression conveyed in the Complaint, *BF4* is not the centerpiece of

7  EA's business.  Rather, *BF4* is just one product among a diversified portfolio of products that

8  during the alleged class period included "blockbusters" like *FIFA*, *Madden NFL*, *NBA Live*, *NHL*,

9  *Battlefield 4*, *Need For Speed Rivals*, and *Plants vs. Zombies*, among other titles.  Ex. F at 6.  At

10  the start of the alleged class period, *BF4* was one of twenty-six titles (eleven console titles and

11  fifteen mobile titles) scheduled to be released during the fiscal year.  Ex. C at 4.

12      Nor was *BF4* the only game published by EA for "next gen" consoles, the two new game

13  systems—Xbox One and PlayStation 4—launched by Microsoft and Sony respectively in the fall

14  of 2013.  It was one of six next-gen games released at that time by EA.  Ex. P at 2.  Versions of

15  those six next-gen games were simultaneously released for "current-gen" game consoles (Xbox

16  360 and PlayStation 3) and personal computers.  *Id*.

17      EA did not promise or predict a bug-free launch for *BF4*, nor could it.  The challenges

18  inherent in launching multiple innovative software games simultaneously on two new console

19  systems are well-known in the video game industry and investing community.  Even so, EA

20  explicitly warned that there were "risks associated with the transition to next-generation

21  consoles" of which *BF4* was a part, and that the risks "could impact sales and marketing."  Ex. F

22  at 4; Ex. J at 4.  Analysts familiar with the video game industry similarly observed that the

23  "conversion to new 'Gen 4' systems adds an element of risk for EA, in that the company will

24  need to seamlessly release both current and Gen 4 versions of its blockbuster games."  Ex. QQ

25  at 1.

26  _____

27  [1] All "CC ¶ _" references are to the Consolidated Complaint, or the "Complaint."  All "Ex. _"
references are to the exhibits attached to Defendants' Request for Judicial Notice in Support of
Defendants' Motion to Dismiss ("RJN").  As demonstrated in the RJN, each of those exhibits

28  may be properly considered on this motion to dismiss.  *See* RJN at 1-9.

1    In addition to noting the risks associated with the console transition, EA warned in its

2    SEC filings that technical defects and issues cannot always be avoided when releasing the

3    Company's extremely complex software programs:

4    **If we release defective products or services, our operating results could
     suffer.**  Products and services such as ours are extremely complex software
5    programs, and are difficult to develop and distribute.  We have quality controls in
     place to detect defects in our products and services before they are released.
6    Nonetheless, these quality controls are subject to human error, overriding, and
     reasonable resource constraints.  <u>Therefore, these quality controls and</u>
7    <u>preventative measures may not be effective in detecting defects in our products</u>
     <u>and services before they have been released into the marketplace.</u>

8

9    Ex. LL at 64 (bold emphasis in original); *see also* Ex. MM at 12 (stating same).

10    As EA noted before the launch, *BF4* was a complex product with ground-breaking

11    technology that enabled sixty-four individuals to play the game simultaneously at sixty frames of

12    graphics per second.  Ex. J at 6-7.  Nevertheless, the information available to Defendants at the

13    time of the launch gave no indication that *BF4* would experience significant technical problems.

14    After being played extensively at the Electronic Entertainment Expo ("E3"), the leading video

15    game convention, *BF4* won twenty-one awards and was named "Best of E3" by *GameSpot*, a

16    prominent gaming magazine.  CC ¶¶ 70, 72.  *BF4* also received excellent reviews and product

17    ratings from three industry publications that tested it prior to launch (Ex. J at 7), and the game

18    was played extensively by customers in non-final form, none of which revealed serious technical

19    issues.  CC ¶¶ 81, 94; Ex. H at 1; Ex. P at 10.  The game also generated customer pre-orders far in

20    excess of the pre-orders received for its predecessor, *Battlefield 3*.  Ex. F at 7; Ex. J at 7.

21    Even the documents cited in the Complaint reveal that Defendants were surprised by the

22    significant technical problems that emerged after *BF4* was publicly released and played on a large

23    scale.  For example, in the "email conversation" attributed to an unidentified *BF4* game developer

24    who is selectively quoted in Paragraph 94 of the Complaint, the developer allegedly stated: "We

25    do test EVERYTHING, we really do"; that *BF4* involved a myriad of "combinations of

26    vehicles/weapons/gadgets and accessories"; and that small changes made in the testing process

27    can result in undetected problems.  CC ¶ 94.  A second alleged game developer referred to in

28    Paragraphs 114 to 116 of the Complaint confirmed that EA did not release *BF4* believing that it

1    had significant technical issues: "[N]o one at EA or DICE has ever said 'F*ck it, let's release it

2    anyway.'" Ex. N at 2.

3          EA's next-gen games for Xbox One and PlayStation 4 were developed using two new

4    "engines" (the underlying technology for gameplay) that provided enhanced graphics and features

5    as well as cost efficiencies. Ex. C at 6. Statements by EA executives that the engines would help

6    "de-risk" the next-gen console transition referred broadly to EA's entire portfolio of next-gen

7    titles, not to *BF4* in particular (*see id.* at 9-10; Ex. D at 9-10; Ex. G at 2-4), and were not

8    considered important by the market. The Complaint fails to identify a single analyst report, blog

9    posting, or media report that even mentions these statements.

10        Nor was *BF4* the primary focus of the market or the key driver of EA's financial

11    performance and stock price. The Company's stock price had increased 30% year-to-date as of

12    March 19, 2013 (CC ¶ 39), more than seven months before *BF4* was sold. The earnings releases

13    and conference calls that followed make clear that the subsequent stock price increases cited in

14    the Complaint were not driven by *BF4*.

15        The 17% stock price increase that followed the May 7, 2013, earnings release and

16    conference call, which Plaintiffs use to construct the starting point of the alleged class period (CC

17    ¶¶ 65, 137), had little to do with *BF4*. The earnings release did not refer to *BF4* at all (Ex. B),

18    and *BF4* was hardly mentioned in the lengthy discussion on the conference call that followed the

19    release. *See* Ex. C. The release and conference call discussion focused on many other subjects of

20    obvious importance to investors, including a major agreement with Disney to publish *Star Wars*

21    games, the planned release of eleven major titles and fifteen mobile titles in the fiscal year, sharp

22    year-over-year increases in projected cash flow, digital revenue, the mobile business, net revenue

23    and gross margins, and a projection that EA would reverse historical trends and hold costs flat in

24    the coming year. *Id.*

25        The July 23, 2013, earnings release that preceded the 6.6% stock price increase cited in

26    the Complaint (CC ¶¶ 75, 138) made no mention of *BF4* (Ex. E), and *BF4* was referred to on the

27    conference call that followed only in conjunction with other "blockbuster" titles, including *FIFA*,

28    *Madden NFL*, *NBA Live*, *NHL*, *Need For Speed Rivals*, and *Plants vs. Zombies*. *See* Ex. F. The

MEMO OF POINTS & AUTHORITIES IN SUPPORT
OF DEFENDANTS' MTD - (MASTER FILE NO. 3:13-
CV-05837-SI)

1    call again focused on a variety of important developments unrelated to *BF4*, including that

2    earnings, revenue, and gross margins were above guidance, and operating expenses were $53

3    million below guidance.  *Id.*

4           The 7.7% stock price increase that followed the October 29, 2013, earnings release and

5    conference call (CC ¶¶ 87, 139) was, again, due primarily to factors unrelated to *BF4*, which had

6    not been sold prior to that date.  The release did not mention *BF4* (Ex. I), and the participants on

7    the earnings call discussed (among other things) that quarterly earnings were 36% above

8    guidance, revenue and gross margins were above guidance, operating expenses were $51 million

9    below guidance and down $82 million year-over-year, and EA was raising its guidance due to

10   favorable results in controlling costs.  *See* Ex. J.

11          Although *BF4* initially experienced unforeseen technical problems following its

12   commercial release, EA acted quickly to address those issues, and the problems had little impact

13   on the Company's business or financial performance.  Ex. P at 2-4, 6; CC ¶¶ 106, 112, 117.  *BF4*

14   and the other next-gen games released during the console transition exceeded sales forecasts in

15   the months following the release.  Ex. P at 2-3.  EA was the number one publisher on next-gen

16   consoles in December 2013 and through April 2014 (Exs. O, NN), and *BF4* ranked second in

17   sales among all products released by EA and its competitors.  Exs. RR at 1; Ex. O.  Indeed,

18   through April 2014, *BF4*, *FIFA 2014*, and *Titanfall*—all released by EA—"were three of the top

19   five best-selling titles across all platforms in the Western World."  Ex. NN.

20          Post-launch reports issued by securities analysts reported that *BF4* was also "one of the

21   top ranked games re online sales."  Ex. SS at 2.  After noting that "the [C]ompany's strong start

22   on next-gen platforms provides a foundation for continued strength through the new platform

23   cycle," one analyst put the *BF4* issues in context, explaining that they had no material adverse

24   impact:

> During the quarter, the company experienced some multiplayer issues with
> Battlefield 4.  We believe the company, which has continuously been updating the
> game, has largely addressed the issues that players have had.  Based on sell-
> through trends, it doesn't appear to us as though there has been a material
> negative impact on the strength of the franchise brought on by these issues.

25

26

27

28

1   Ex. TT at 2.

2          EA's stock price increased substantially after the alleged class period.  By May 30, 2014,

3   approximately six months after the end of the class period, the Company's stock had risen 67% to

4   $35.13, a 26% increase over the class period high of $27.99.  *See* Ex. UU.

5   <u>**ARGUMENT**</u>

6          To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual

7   matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*,

8   556 U.S. 662, 678 (2009).  The Court need not accept as true allegations that contradict

9   documents referred to in the complaint or matters subject to judicial notice, or allegations that are

10  conclusory, unwarranted deductions of fact or unreasonable inferences.  *Daniels-Hall v. Nat'l*

11  *Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  The Private Securities Litigation Reform Act of

12  1995 ("Reform Act") imposes two additional exacting pleading requirements in Section 10(b)

13  cases, both of which must be met in order for a securities fraud complaint to survive dismissal.

14         First, the complaint must specify each statement alleged to have been misleading, the

15  reason(s) why the statement is misleading, and all facts on which that belief is formed *with*

16  *particularity*.  15 U.S.C. § 78u-4(b)(1).  "This means that a plaintiff must provide, in great detail,

17  all the relevant facts forming the basis of her belief.  It is not sufficient for a plaintiff's pleadings

18  to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts

19  that will validate her claim."  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir.

20  1999).

21         Second, the complaint must state *with particularity* facts giving rise to a "strong

22  inference" that the defendants acted with the required state of mind, i.e., scienter.  15 U.S.C.

23  § 78u-4(b)(2).  Because the Supreme Court has defined Section 10(b) scienter as "a mental state

24  embracing intent to deceive, manipulate or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185,

25  193 n.12 (1976), to avoid dismissal a plaintiff must plead in great detail facts to support a "strong

26  inference" that the defendants made false or misleading statements *intentionally* or with

27  *deliberate* recklessness, *In re Silicon Graphics*, 183 F.3d at 974.  A "strong inference" of scienter

28  is one that is "more than merely plausible or reasonable"—it must be "powerful," "cogent," "and

1    at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 323-24.  Under this

2    comparative approach, the Court must weigh all competing facts and inferences, including those

3    that are *unfavorable* to plaintiffs because they undercut or suggest alternatives to an inference of

4    fraud.  *See id.*; *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

5            As demonstrated below, the Complaint does not satisfy either of these pleading

6    requirements and, in addition, is based on alleged misstatements that are inactionable as a matter

7    of law.  It must be dismissed for each of these reasons.

8    I.      **THE ALLEGED MISSTATEMENTS ARE INACTIONABLE AS A MATTER OF LAW**

9            As an initial matter, the alleged misstatements cited in the Complaint are legally

10   inactionable.[2]  Most of them cannot form the basis of a securities fraud claim because they were

11   made after Plaintiffs purchased their EA stock.  All of the alleged misstatements are legally

12   inactionable because they consist of vague statements of opinion and optimism, or puffery.

13           **A.      Most Of The Alleged Misstatements Are Inactionable As A Matter Of Law**
14                   **Because They Post-Date Plaintiffs' Purchases**

15           Plaintiffs' last purchase of EA stock during the alleged class period was on October 16,

16   2013.  Ex. VV.  Six of the nine purported misstatements alleged in the Complaint were made after

17   that date, on October 29 and December 3, 2013.  *See* CC ¶¶ 83-86, 103.  As a matter of law,

18   "[s]uch post-purchase statements cannot form the basis of Rule 10b–5 liability, because the

19   statements could not have affected the price at which [P]laintiff[s] actually purchased" EA stock

20   or their decision to do so.  *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992);

21   *see also Winer Family Trust v. Queen*, 503 F.3d 319, 325-26 (3d Cir. 2007) ("Winer only has

22   standing to pursue fraudulent conduct on or before its May 22, 2002 purchase date."); *Klein v.*

23   *Gen. Nutrition Cos., Inc.*, 186 F.3d 338, 345 (3d Cir. 1999) ("[P]ost-purchase statements cannot

24   be a basis for liability."); *Levine v. NL Indus., Inc.*, 720 F. Supp. 305, 308 (S.D.N.Y. 1989)

25

26   _____
        [2] Messrs. Probst and Söderlund are not alleged to have made *any* of the challenged statements.
27   *See* CC ¶¶ 62, 69, 74, 83-86, 103.  Plaintiffs' Section 10(b) claim against these two Defendants
     thus must be dismissed, since "liability under Rule 10b-5 is limited to parties who actually 'make'
     misstatements." *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1060 (N.D. Cal. 2013) (citing *Janus*
28   *Capital Grp., Inc. v. First Deriv. Traders*, 131 S. Ct. 2296, 2302 (2011)).

1   ("[F]ive of these representations were made after Levine had purchased his stock.  Thus, these

2   representations are not actionable under section 10(b) and Rule 10b-5 by a class represented by

3   Levine."), *aff'd*, 926 F.2d 199, 204 (2d Cir. 1991) ("[W]e affirm for the reasons stated by the

4   district court in its opinion addressing that issue.").

5          Because they are inactionable as a matter of law, the Court need not even consider

6   whether the October 29 and December 3 statements are adequately alleged to be false or

7   materially misleading.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992)

8   ("We need not determine whether this statement is misleading because it was issued after Hanon

9   bought his stock and thus could not have affected his stock's April 14, 1989 market price or his

10  decision to buy on that date."); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 993 (1st Cir. 1996)

11  ("Regardless of the merits, because Gross purchased his stock on May 27, 1994, well before

12  Summa Four issued the June 29 [statements], he has no standing to complain about the statements

13  . . . .").

14          **B.     All Of The Alleged Misstatements Are Legally Inactionable Because They Are**

15          **Vague Statements Of Opinion, Corporate Optimism, And "Puffery"**

16          "Vague, generalized, and unspecific assertions of corporate optimism or statements of

17  mere puffing cannot state actionable material misstatements of fact under federal securities laws."

18  *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal.

19  2005) (quotations omitted).  Because investors are presumed to "know how to devalue the

20  optimism of corporate executives," *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010),

21  "courts have routinely held that vague or amorphous statements of optimism and 'puffing' about

22  a company or a product are not actionable," *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007

23  WL 760535, at *21 (N.D. Cal. Mar. 9, 2007).  Such statements "are too squishy, too untethered to

24  anything measurable, to communicate anything that a reasonable person would deem important to

25  a securities investment decision."  *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d

26  651, 671 (6th Cir. 2005).

27          As the numerous cases cited below make clear, the statements alleged in the Complaint

28  are textbook examples of the "vague," "generalized," "unspecific" and "squishy" expressions of

1    corporate optimism that are incapable of sustaining a securities fraud complaint.  That fact

2    requires dismissal, independent of Plaintiffs' failure to allege falsity or scienter.

3           <u>Statement 1</u>: Mr. Jorgensen's October 29 statement comparing *BF4* to a "World Series"

4    "ace" pitcher being sent "to the mound" to clinch victory (CC ¶ 83) is quintessential puffery.  *See,*

5    *e.g.*, *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 895 (D. Minn. 2007) (holding that

6    "[product is the] Holy Grail of memory" was inactionable), *aff'd*, 527 F.3d 749 (8th Cir. 2008).[3]

7           <u>Statement 2</u>: Mr. Wilson's October 29 statement, "[W]e have a launch slate of games that

8    are the best transition games that I've ever seen come out of this Company" (CC ¶ 84), is another

9    classic example of puffery.[4]  Indeed, a virtually *identical* statement made by another video game

10   publisher was held to be inactionable in *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d

11   1152, 1164-65 (N.D. Ill. 2004) (holding that "The Company believes these products comprise the

12   strongest home video game lineup in Midway's history" was inactionable).

13          <u>Statement 3</u>: Mr. Wilson's October 29 statement, "[C]oming out of the last transition, we

14   were resolute in our desire to ensure we didn't have that kind of [product development] challenge

15   again" (CC ¶ 84), is inactionable for the same reasons.  *See, e.g.*, *In re Ford Motor*, 381 F.3d at

16   570-71 (holding that "at Ford quality comes first," "Ford has 'dedicated . . . [itself] to finding

17   even better ways of delivering . . . safer vehicles," "[w]e want to ensure that all our vehicles have

18   world-class quality . . . developing cars and trucks that are *defect-free*" were inactionable

19

20          [3] *See also Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008) ("on the
     technology front we hit the ball out of the park" inactionable); *Wozniak v. Align Tech., Inc.*, 850
21   F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("projecting . . . a 'blowout winner' product"
     inactionable); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1070 (C.D. Cal. 2012)
22   ("[product] is ready for 'prime time'" inactionable).

            [4] *See, e.g.*, *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) ("Ford has its
23   best quality ever" inactionable); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 465-66
     (S.D.N.Y. 2000) ("Our product lines have never been stronger" inactionable); *City of Royal Oak*
24   *Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) ("product
     portfolio is robust" inactionable); *Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142, 153 (D. Conn.
25   2004) (calling software "great" and "one of the most significant product offerings in recent years"
     inactionable); *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 71 (D. Mass. 1998)
26   ("[company] provide[s] the best hardware and software" inactionable); *In re Apple Computer,*
     *Inc. Sec. Litig.*, 127 F. App'x 296, 304 (9th Cir. 2005) ("this is going to be the best Power Mac
27   ever" inactionable); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal.
     2004) ("we feel that [defendant] has a strong product set" and "these products will continue to
28   position [defendant's] solutions as best-of-breed" inactionable).

(emphasis in original)).[5]  In any event, no facts are alleged in the Complaint to show that Defendants were not "resolute in [their] *desire* to ensure" that EA "didn't have that kind of challenge again."

Statement 4: Mr. Moore's October 29 statement, "We've not had some of the problems some of our fellow publishers in the industry have in getting our quality titles ready for next gen. We feel . . . we're well ahead of this transition and we're going to nail it" (CC ¶ 85), is a garden-variety "we're-leading-the-competition-and-well-positioned-to-execute" statement that courts have consistently held to be inactionable.[6]  Any claim based on this statement also fails because it lacks foundation, as the Complaint alleges no facts whatsoever about the types of problems "other publishers" had encountered.  *See In re Silicon Graphics*, 183 F.3d at 984 (the Reform Act's "statutory command that a plaintiff plead all the 'facts' with 'particularity' [] mean[s] that a plaintiff must provide a list of all relevant circumstances in great detail").

Statements 5 and 6: Mr. Wilson's October 29 statement, "I think that our launch software this time is head and shoulders above where we were last time . . . .  So we are certainly bullish as we come into this platform generation, particularly as well as we have executed" (CC ¶ 86), and his December 3 statement, "I think that we have reached a level of quality at launch that we didn't get to last time, and our teams are already starting to think about investment in new innovation for the future" (CC ¶ 103), are also run-of-the-mill inactionable statements of opinion and corporate

---

[5] *See also Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) ("these statements—generally describing the 'high priority' Tektronix placed on product development . . . [are] 'puffery'"); *Wozniak v. Align Tech., Inc.*, 2011 WL 2269418, at *3 (N.D. Cal. June 8, 2011) ("[w]e . . . refocused our efforts on product development" inactionable); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *25 (N.D. Ill. Feb. 13, 2013) ("[company] is 'redoubling [its] commitment to quality'" inactionable); *Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 301 (D. Mass. 2004) ("[we have] total commitment to product development" inactionable); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 829 (W.D. Mich. 2012) ("Company remains committed to . . . manufacturing . . . products that are safe and effective" inactionable).

[6] *See, e.g., In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) ("we already have a sizable lead over our competition," "well positioned," "extremely well positioned," "strong foundation," "hitting on all cylinders," "exceeding . . . expectations," and "claims of industry leading growth, growth that positions us beautifully," "accomplishment we have achieved," "and other similar statements all constitute inactionable corporate optimism); *In re Midway Games*, 332 F. Supp. 2d 1163, 1165 ("Midway is well positioned to capitalize . . . with a broad portfolio of products for . . . all three next generation platforms and the Game Boy Advance" inactionable).

optimism.  *See, e.g.*, *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827 (C.D. Cal. 1998) (holding that "[company's] success was due to its 'crisp execution on the timing, performance, reliability, and quality' of its products" was "best described as hyperbole or corporate puffery").[7] Apart from the fact that the statements are inactionable as a matter of law, there is not a single allegation in the Complaint to support a claim that EA's many "teams" were not "already starting to think about investment in new innovation for the future."  *See In re Silicon Graphics*, 183 F.3d at 984.

Statements 7, 8, and 9: Messrs. Gibeau's and Moore's May 7, June 12, and July 23 statements noting that with the Frostbite 3 and EA SPORTS Ignite engines EA had "largely" "de-risked" the "technology side or the engine side" of the transition to next-gen consoles (CC ¶¶ 62, 69, 74), are similarly vague and amorphous statements of opinion and optimism that have consistently been held insufficient as a matter of law to support a claim for securities fraud. Moreover, Defendants were expected, and entitled, to be optimistic and confident regarding EA's transition of its product line to next-gen consoles, which was a market-leading success.  *See* p. 6, *supra*.  Under Section 10(b), "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994).

## II.    THE COMPLAINT FAILS TO ALLEGE FALSITY

In addition to relying entirely on "misstatements" that are legally inactionable, Plaintiffs also fail to plead particularized facts showing that any statement was false or materially

---

[7] *See also In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) ("product line [is] 'improved'" was inactionable); *In re Metricom Sec. Litig.*, 2004 WL 966291, at *30 (N.D. Cal. Apr. 29, 2004) ("We have launched the Ricochet network at a tremendous pace" and "Our roll-out plan is unmatched" inactionable); *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) ("we are 'bullish'" and "these new products . . . they're phenomenal" inactionable); *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2013 WL 5206216, at *13 (S.D. Cal. Sept. 13, 2013) ("The word 'quality' and its synonyms, without more, are subjective, not objective words" and thus cannot "serve the basis of a securities fraud action"); *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 890 (E.D. Mo. 2012) ("SmartStax and Roundup Ready 2 are 'winning products'" inactionable); *Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 998-99 (N.D. Cal. 2007) ("high quality [products]" and "high performance [products]" inactionable).

1    misleading.  That failure would require dismissal of the Complaint even if the alleged

2    misstatements were otherwise actionable.  *See* 15 U.S.C. § 78u-4(b)(1).

3        **A.      Most Of The Alleged Misstatements Did Not Refer To *BF4***

4        The Complaint is predicated on post-launch problems with *BF4*, but with one minor

5    exception (CC ¶ 83) the alleged misstatements do not even mention *BF4*—they are generic

6    statements about EA's entire portfolio of next-gen games (CC ¶¶ 62, 69, 74, 84–86, 103), which,

7    as noted at page 3 above, consists of numerous titles.  That disconnect is fatal.  *See Schuster v.*

8    *Symmetricon, Inc.*, 2000 WL 33115909, at *6 (N.D. Cal. Aug. 1, 2000) (dismissing complaint

9    alleging misstatements relating to company's new product where "many of the general statements

10   identified in the complaint [did] not even relate specifically to the [product]").

11       **B.      The Alleged Misstatements Did Not Promise A Problem-Free Launch**

12       Even if the statements had specifically referred to *BF4*, no reasonable investor could

13   interpret vague phrases like "the technology side or engine side [of the transition] has largely

14   been de-risked," or "we wanted to de-risk the technology piece [of the transition] as much

15   possible," or "we have started early on Ignite and Frostbite 3, and derisk the technology engine

16   component of making the transition" (CC ¶¶ 62, 69, 74), as guarantees that *BF4*'s launch would

17   be problem-free.  *See Gammel*, 905 F. Supp. 2d at 1075 ("While allegations regarding technical

18   'bugs' in the webOS software . . . are sufficient to establish that the TouchPad contained flaws, . .

19   . Plaintiffs fail to adequately allege that a reasonable investor would have relied on Apotheker's

20   puffing promises of 'perfection.'").

21       On the contrary, the "fact that a new product might face problems in the market is obvious

22   to a reasonable investor." *Zouras v. Hallman*, 2004 WL 2191034, at *9 (D.N.H. Sept. 30, 2004)

23   (quoting *In re Boston Tech.*, 8 F. Supp. 2d at 63).  It is universally understood that unforeseen,

24   technical issues may arise when launching complex software products—especially when the

25   products are to be used with newly-released hardware (e.g., next-gen game consoles).  *See*

26   *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 667 (5th Cir. 2004) ("Temporary glitches in

27   technology products are by no means a rare or devastating occurrence.").  As one court stated in

28   dismissing a factually similar securities fraud complaint: "[O]ne would be hard pressed to find a

software program on the market without at least some technical glitches." *Frazier*, 341 F. Supp.

2d at 154 n.4; *see also In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (N.D. Cal. 1992)

("[T]he securities laws presume that skilled investors are aware that a corporation's performance

with a new product . . . is unlikely to replicate past successes."), *aff'd*, 11 F.3d 865 (9th Cir.

1993).[8]

Judge Breyer underscored the same point in dismissing another factually similar securities

fraud complaint arising out of a software company's launch of a new program that had significant

functionality issues:

> That a new program has kinks does not make a positive statement about the
> program false.  If that were the case, the federal securities laws would prevent
> software companies from making any positive statements about new software.

*In re Siebel Sys., Sec. Litig.*, 2005 WL 3555718, at \*4 (N.D. Cal. Dec. 28, 2005), *aff'd*, 261 F.

App'x 60 (9th Cir. 2007).

EA nevertheless explicitly disclosed that its complex software products might experience

technical problems once released into the marketplace.  *See* p. 4, *supra*.

**C.**     **The Alleged Misstatements Were Justified When Made And Borne Out By
          Subsequent Events**

Moreover, the optimistic statements and opinions that Plaintiffs attack cannot be false or

materially misleading because, as the Complaint and documents it cites make clear, they were

justified when they were made.  At that time, *BF4* had (1) garnered a host of awards, (2) been

named "Best of E3" by *GameSpot*, (3) received high ratings from sophisticated industry

publications, and (4) generated a large number of pre-orders after consumers played and tested a

---

[8] In fact, it is not uncommon for video game companies to experience technical problems with their games upon release to the market, notwithstanding extensive pre-launch testing.  *See, e.g.*, Chris Pereira, "*Watch Dogs* suffering from login issues and more on launch day," *GameSpot*, May 27, 2014 (available at http:// www.gamespot.com/articles/watch-dogs-suffering-from-login-issues-and-more-on-launch-day/1100-6419894/); Wesley Yin-Poole, "Warner apologises for *Batman: Arkham Origins* technical problems," *Eurogame.net*, November 1, 2013 (available at http://www.eurogamer.net/articles/2013-11-01-warner-apologises-for-batman-arkham-origins-technical-problems); ABC News, "Glitches plague Rockstar Games' *Grand Theft Auto Online* launch; gamers vent frustrations on Twitter," ABC News, October 2, 2013 (available at http://www.10news.com/lifestyle/technology/glitches-plague-rockstar-games-grand-theft-auto-online-launch-gamers-vent-frustrations-on-twitter10022013).

1   beta version that revealed no significant technical problems.  Indeed, even engineers who were

2   involved in the day-to-day development and testing of *BF4* were unaware of any "game-

3   breaking" bugs prior to the game's launch.  *See* pp. 4-5, *supra*.

4         Defendants' positive statements were not only appropriate when made, but they also were

5   borne out by subsequent events.  Plaintiffs do not allege that *BF4* was the subject of any

6   consumer class action or product liability lawsuit (because it was not), and *BF4* itself proved to be

7   a resounding financial success and industry leader.  *See* p. 6, *supra*.

8
9
       **D.     The Complaint Does Not Allege Facts Sufficient To Show That Any Alleged
                Misstatement Was False *When Made***

10        Inherent in the concept of falsity is the requirement of contemporaneousness—a statement

11  must have been "untrue or misleading *when made*."  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993

12  (9th Cir. 1999) (emphasis added).  Thus, to satisfy the Reform Act's pleading requirements, a

13  complaint must allege specific contemporaneous facts demonstrating that the alleged

14  misstatements were false or misleading when they were made.  *See Metzler Inv. GMBH v.*

15  *Corinthian Coll., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  "Without evidence of

16  contemporaneous falsity, an allegation of a misleading representation, which entirely rests on

17  later contradictory statements [or state of affairs], constitutes an impermissible attempt to plead

18  fraud by hindsight."  *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d

19  1092, 1109 (E.D. Wash. 2013) (citation omitted); *see also Yourish*, 191 F.3d at 997.

20        Plaintiffs here fail to allege any contemporaneous facts that might show that any statement

21  was false at the time it was made.  Instead, the Complaint relies on hindsight to attack statements

22  that were, at the time, appropriate.  Plaintiffs allege, for example, that under "EA's QA testing

23  protocol," if "a tester found an A-rated bug," she was "required to call the game's developers to

24  inform them of the issue over the phone," and that "[g]ames could not be released with any

25  known A-rated bugs."  CC ¶ 78(e).  Based on that allegation, the Complaint asserts that because

26  *BF4* "launched with a known game-breaking error," it "indicates defendants knew or recklessly

27  disregarded that it could not have been 'de-risked' as of May 7, 2013, June 12, 2013, or July 23,

28  2013."  *Id.*

MEMO OF POINTS & AUTHORITIES IN SUPPORT
OF DEFENDANTS' MTD - (MASTER FILE NO. 3:13-
CV-05837-SI)

1    In addition to being directly contradicted by documents quoted and cited in the Complaint,

2    that conclusory assertion is meaningless because the Complaint does not allege that any *BF4*

3    tester actually found an "A-rated bug" or "game-breaking error" prior to May 7, June 12, or July

4    13 (or even before the game launched in November 2013), and thus there is no basis for

5    Plaintiffs' assertions that *BF4* was released with a "known game-breaking error."  For the same

6    reason, the Complaint fails to allege anything to support the conclusion that Defendants "knew or

7    recklessly disregarded that [*BF4*] could not have been 'de-risked.'"

8    Similarly, while the Complaint refers to EA's release of a "Top Issues Tracker" that listed

9    "game-breaking" bugs following *BF4*'s launch (CC ¶¶ 105, 112-13), it does not allege that any

10   "game-breaking" bugs were actually listed on EA's internal trackers *before* the launch.

11   Accordingly, the point is irrelevant to the falsity analysis.  *See, e.g.*, *In re Read-Rite Corp. Sec.*

12   *Litig.*, 2004 WL 2125883, at *5 (N.D. Cal. Sept. 22, 2004) ("The [later] statements admitting that

13   technical problems continued to hinder . . . production of the 40GB products, despite prior

14   optimistic statements, do not rise to the level of directly contradictory or inconsistent statements

15   from which falsity can be inferred.").

16   Plaintiffs' inability to allege specific contemporaneous facts demonstrating that any

17   statement was false or materially misleading when made is further underscored by the

18   Complaint's selective quotation of a pre-launch interview with EA executive Patrick Bach in

19   which Bach noted the complexity of developing *BF4* and that EA at times had contemplated

20   delaying the game's launch.  CC ¶¶ 79-81.  The Complaint does not allege that Bach ever stated

21   that *BF4* was not ready for launch or that he ever conveyed such a sentiment to any of the

22   individual Defendants.  In fact, Bach believed that EA had "overcome th[e] hurdles" that led

23   another game publisher to delay one of its next-gen games.  CC ¶ 80.

24   Moreover, the interview provides another example of a document that *undercuts*

25   Plaintiffs' attempt to plead falsity.  In the portion omitted from the Complaint, Bach described the

26   progress of the public beta testing of *BF4*, which *validated* his belief: "We're getting really good

27   feedback.  *I think we've got more or less everything [bugs] that people have found now, people*

28   *are finding less and less and just playing for fun*."  Ex. H at 1 (emphasis added).  Statements in

1   the Complaint allegedly attributed to two unidentified game developers make the same point, and

2   also affirmatively show that no one—much less Defendants—was aware of any "game-breaking"

3   bugs prior to *BF4*'s launch.  *See* pp. 4-5, *supra*.

4   **III.    THE COMPLAINT FAILS TO CREATE A STRONG INFERENCE OF SCIENTER**

5           Not only does the Complaint fail to plead a legally actionable misstatement or falsity, it

6   also fails to plead a strong inference of fraudulent intent.  *See* 15 U.S.C. § 78u-4(b)(2).  As

7   numerous courts have recognized, "[b]ecause design, marketing and manufacturing problems are

8   common to business, a securities fraud claim must do more than allege the existence of such

9   problems; plaintiffs must allege with particularity that a *speaker knew* that the severity, timing

10  and extent of such problems rendered the statement false when made."  *In re Apple Computer*,

11  127 F. App'x at 303 (emphasis added).  Thus, "[i]t is critical that [P]laintiffs . . . allege that

12  [D]efendants knew of the problems with [*BF4*], and knew of them before the end of the class

13  period," otherwise they "could not have intentionally misled investors regarding the prospects for

14  the product."  *Frazier*, 341 F. Supp. 2d at 155.  Plaintiffs again fall *far* short of the mark.

15          **A.      The Complaint Lacks The Specificity And Corroboration Required To
16                   Plead Scienter**

17          As this Court has recognized, to allege a strong inference of scienter, a plaintiff must

18  "plead *in great detail*, facts constituting strong circumstantial evidence of deliberately reckless or

19  conscious misconduct," and must do so as to *each* defendant individually.  *Rudolph v.*

20  *UTStarcom*, 560 F. Supp. 2d 880, 889, 891 (N.D. Cal. 2008) (Illston, J.) (quotations omitted;

21  emphasis added) (dismissing complaint).  The Reform Act requires "specifics or corroborating

22  details of time, persons, places, and subjects."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079,

23  1091 (9th Cir. 2002).  The Complaint alleges no such details as to *any* Defendant.

24          Instead, the Complaint's scienter allegations lump all Defendants together (CC ¶¶ 78, 90,

25  105, 127-29), "without further differentiation or individuation (including the roles played by the

26  individual [D]efendants), or specification of the facts that [each of them] . . . knew" at any given

27  time. *McCasland v. FormFactor Inc. (FormFactor I)*, 2008 WL 2951275, at *10 (N.D. Cal. July

28  25, 2008) (Illston, J.) (dismissing complaint).  Plaintiffs make *no* attempt to show what *any*

1  Defendant knew at the time *any* alleged misstatement was made, or to marshal particularized

2  contemporaneous facts showing that a Defendant had any information—whether via internal

3  reports, meetings, or otherwise—that might cast doubt on any statement.  *See In re Read-Rite*

4  *Corp. Sec. Litig.*, 335 F.3d 843, 847 (9th Cir. 2003) (affirming dismissal because "complaint

5  contains no factually particular allegations which strongly imply Defendant's *contemporaneous*

6  knowledge that the statement was false when made" (emphasis in original)).

7        This Court dismissed a similar—but much stronger—complaint in *McCasland v.*

8  *FormFactor Inc. (FormFactor II)*, 2009 WL 2086168 (N.D. Cal. July 14, 2009) (Illston, J.).  Like

9  Plaintiffs' pleading here, the complaint in *FormFactor II* alleged that defendants made overly

10  optimistic statements about a high-tech product while being aware of its defects.  The

11  *FormFactor II* complaint set forth a host of "confidential witness" allegations and references to

12  internal documents and alleged discussions that purported to show that certain lower-level

13  employees were aware of information that contradicted the public statements at issue.  The

14  complaint was nevertheless dismissed because it did "not (1) identify any specific information

15  that was either received or communicated by any *defendant*, that (2) contradict[ed] any public

16  statement at the time it was made."  *Id.* at *6 (emphasis added).

17        The Complaint here contains no allegations attributed to "confidential witnesses" or

18  references to any internal documents or meetings.  In fact, there is no particularized allegation

19  that *any* EA employee was aware of any information that contradicted any public statement.  For

20  example, no confidential witness is alleged to have spoken to any Defendant regarding any *BF4*

21  bugs, to have heard any statement made by any Defendant regarding *BF4*-related problems, to

22  have attended any meeting with any Defendant at which any *BF4* problem or bug was discussed,

23  or to have either sent or received any report, memorandum, or email to or from any Defendant on

24  any such topic.  These failures are fatal, as a host of cases dismissing *far* stronger complaints

25  based on software bugs make clear.  *See, e.g.*, *In re Siebel*, 2005 WL 3555718, at *5 (holding that

26  strong inference of scienter was not pled where there was "not a single allegation that any . . .

27

28

1    specific Siebel employee complained to Siebel management about Siebel 7, let alone that . . .

2    Siebel 7 had an 'abnormally large number of bugs'").[9]

3         Nor does the Complaint identify any contemporaneous internal report, memorandum,

4    email, meeting or other communication that would suggest that any Defendant believed that any

5    public statement was false or misleading.  *See, e.g.*, *FormFactor I*, 2008 WL 2951275, at *8

6    (dismissing complaint that failed to allege any "detail or corroboration" such as "meetings,

7    conversations, and internal memoranda and reports" to "support the inference that any of the

8    individual defendants actually believed [their] public statements might be false or misleading at

9    the time they were made"); *In re Apple Computer, Inc. Sec. Litig.*, 2003 WL 26111982, at *4

10   (N.D. Cal. Aug. 13, 2003) (dismissing complaint where plaintiffs failed "to allege the contents of

11   any specific memos, messages or meetings" that would have made defendant aware of defects in

12   new computer product), *aff'd*, 127 F. App'x 296 (9th Cir. 2005).

13        Plaintiffs are thus reduced to alleging that Defendants "must have known" that *BF4* was

14   afflicted with "game-breaking defects."  *See* CC ¶¶ 78(d)-(e), 109.  In addition to falling short of

15   legal requirements regarding particularity and corroboration, that conclusory hindsight assertion

16   is refuted by the Complaint's citation and quotation of statements attributed to developers who

17   worked on *BF4*, which show that not even engineers who developed the game were aware of any

18   significant problems prior to its launch.  *See* pp. 4-5, *supra*.

19        "[S]peculation regarding what Defendants must have known [about bugs] is not an

20   adequate substitute for allegations purporting to show what Defendants *actually* knew."  *Gammel*,

21   ───────────────

22        [9] *See also Frazier*, 341 F. Supp. 2d at 154-55 (strong inference of scienter was not pled where complaint cited "Senior Software Specialist" who stated that testing "revealed 'bugs that prevented the product from performing as advertised,'" because plaintiff did "not allege that the Senior Software Specialist ever shared this knowledge with the named defendants and, if so, whether he/she did so during the class period"); *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *18 (E.D.N.Y. Sept. 19, 2005) (allegation that beta testers discovered bugs with high-tech product touted by defendants did not raise strong inference of scienter because "[t]he complaint does not allege to what extent beta testers criticized [the product], or to whom"); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 375-76 (5th Cir. 2004) (strong inference of scienter was not pled despite allegation that defendants were repeatedly told by programmers that software would not work as represented, because complaint "fail[ed] to state when, where or on what occasion or occasions this occurred, fail[ed] to in any way identify the [] programmers and developers involved, and [did] not indicate whether their statements were oral or written or give[] any meaningful particulars as to what was stated").

MEMO OF POINTS & AUTHORITIES IN SUPPORT
OF DEFENDANTS' MTD - (MASTER FILE NO. 3:13-
CV-05837-SI)

1   905 F. Supp. 2d at 1079 (emphasis added); *see also Wollrab v. Siebel Sys., Inc.*, 261 F. App'x 60,

2   61 (9th Cir. 2007) (affirming dismissal since plaintiff "did not plead sufficient facts to give rise to

3   a strong inference that Siebel knew of problems with the [software] at the time that the company

4   was touting the product"); *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *11 (N.D. Ill.

5   Oct. 19, 2009) (dismissing complaint that did not contain "specific facts [to] support the

6   conclusion" that defendants "already knew that *Rise & Fall* contained an 'abnormal[ly] high

7   number of bugs'" at the time of their positive statements).

8         Although the Complaint attempts to portray statements made well after *BF4*'s launch

9   acknowledging customer complaints and noting EA's efforts to address them as "revelations" that

10  support an inference that pre-launch statements were knowingly false (CC ¶¶ 112-21), that effort

11  fails for the same reasons.  The post-launch statements do not in any way contradict the pre-

12  launch statements.  Moreover, statements acknowledging issues after they arise are insufficient to

13  show that earlier statements were false—much less knowingly false.  *See, e.g.*, *In re Read-Rite*,

14  335 F.3d at 847-48; *Yourish*, 191 F.3d at 997.

15        **B.     The "Core Operations" Presumption Does Not Create A Strong Inference of**
          **Scienter, Especially Under The Facts Of This Case**
16

17        Unable to plead any particularized facts from which to infer that any Defendant acted with

18  scienter, Plaintiffs invoke the so-called "core operations" presumption (CC ¶¶ 127-29), which in

19  very limited circumstances can be employed to attribute knowledge of certain core operations to

20  company executives.  *Cf. Metzler*, 540 F.3d at 1068 (noting general rule that "corporate

21  management's awareness of the day-to-day workings of the company's business does not

22  establish scienter" absent particularized allegations "of specific information conveyed to

23  management and related to the fraud").  The "core operations" presumption, however, does not

24  apply to this case.

25        The *BF4* game, and more specifically, the technical details regarding the launch of the

26  game, do not constitute the "core" of EA's operations.  They make up but *one* piece of the

27  development of *one* game, which, as discussed at page 3 above, is itself only *one* part of a broad

28  and diverse product line.  *See, e.g.*, *Gammel*, 905 F. Supp. 2d at 1078 (holding that core

1    operations presumption was inapplicable where the product at issue "constituted only one

2    component" of "the HP business segment housing PCs and printers"). Indeed, the *Battlefield*

3    franchise accounted for less than 10% of EA's revenue in FY 2013 and FY 2014, and only 11%

4    of its revenue in FY 2012. Ex. PP at 5; *see Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323,

5    343-44 (S.D.N.Y. 2011) (core operations presumption was inapplicable where the business

6    segment at issue represented only 16% of the company's business); *In re Federated Dept. Stores,*

7    *Inc. Sec. Litig.*, 2004 WL 444559, at *6 (S.D.N.Y. Mar. 11, 2004) (troubles with business

8    constituting only 10% of total assets not a core operation and thus presumption inapplicable).

9          Moreover, the core operations presumption may be used only (1) where there are "detailed

10   and specific allegations about management's exposure to factual information within the

11   company," or (2) in "the exceedingly rare category of cases" where "the nature of the relevant

12   fact is of such prominence that it would be 'absurd' to suggest that management was without

13   knowledge of the matter." *S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 785-86 & n.3 (9th Cir.

14   2008). Plaintiffs allege no facts—much less detailed and specific facts—demonstrating that any

15   Defendant had information about significant *BF4*-related technical problems.

16         Nor would it be "absurd to suggest" that Defendants lacked knowledge about significant

17   *BF4*-related technical problems. To the contrary, the Complaint and the documents it cites

18   indicate that no one, not even developers who worked on *BF4*, was aware of any "game-

19   breaking" bugs prior to launch. *See* pp. 4-5, *supra*. If the developers were unaware of any

20   "game-breaking" bugs prior to launch, then the existence of such bugs could not have been

21   "patently obvious" to senior executives like Defendants. *Zucco Partners, LLC v. Digimarc*

22   *Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009); *see, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 2011 WL

23   4831192, at *11 (N.D. Cal. Oct. 12, 2011) ("The SCAC includes no specific allegations that

24   anyone, let alone [the CEO], concluded that the likely financial impact of the material set problem

25   would exceed the company's normal reserve. Without such a determination, the falsity of

26   NVIDIA's statements cannot be considered 'patently obvious.'"); *In re Century Aluminum Co.*

27   *Sec. Litig.*, 749 F. Supp. 2d 964, 973 (N.D. Cal. 2010) (Illston, J.) ("[T]he FAC does not allege

28   why the falsity of the original statements would have been obvious to corporate management.").

**C.      Plaintiffs' Allegations Of Inadequate Testing Protocols Do Not Plead Fraud**

Rather than focusing on the requirements for alleging a Section 10(b) claim and attempting to satisfy them, the Complaint goes to great lengths to argue that *BF4* should have been tested more extensively before being released to the public.  *See* CC ¶¶ 11, 78(c), 94, 114-17, 120-21.  But under settled law, allegations of "weak internal controls" or "poor testing protocols" and the like cannot support a claim of securities fraud.  *See In re GlenFed, Inc. Sec. Litig.*, 11 F.3d 843, 848-49 (9th Cir. 1993), *vacated on other grounds*, 42 F.3d 1541 (9th Cir. 1994); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 638-39 (3d Cir. 1989) ("[C]laims essentially grounded on corporate mismanagement are not cognizable under federal law.").

As one court recently held in a case in which plaintiffs similarly relied on a company's purportedly "poor testing protocols" and past quality control issues to allege that positive statements touting the "high quality" of its products were fraudulent:

> Though, in hindsight, additional live model testing may have prevented the sheerness issues that caused the Black Luon Recall, the allegations in the CAC concerning the Recall do not meet the standard for recklessness. . . .  At most, these allegations speak to areas of corporate mismanagement, not securities fraud.

*In re Lululemon Sec. Litig.*, --- F. Supp. 2d ---, 2014 WL 1569500, at *21-22 (S.D.N.Y. Apr. 18, 2014); *see also Van Ormer v. Aspen Tech., Inc.*, 145 F. Supp. 2d 101, 105 (D. Mass. 2000) (dismissing complaint alleging positive statements were false because "Aspen's products were plagued with technical problems because they were released too early," since it "amount[ed] to nothing more than complaints of poor management, not securities fraud").

**D.      The Complaint Fails To Satisfy The Requirements Established In *Tellabs***

Even if the Complaint alleged specific and corroborative facts as to each Defendant's alleged intent (which it does not), it would independently fail under the analysis required by *Tellabs*, because the theory of fraud at the core of the Complaint could not support even a reasonable inference of fraud—much less one that is "strong," "cogent" and "compelling."  *See FormFactor II*, 2009 WL 2086168, at *6-8.  The Complaint's fatal deficiencies are further highlighted under *Tellabs*' weighing analysis, in which all relevant factors, including

- 22 -

"nonculpable" inferences and explanations must be considered in determining whether the Complaint can support a strong inference of fraudulent intent.  551 U.S. at 323-24.

### 1.     The Complaint Lacks A Cogent And Compelling Theory of Fraud

Plaintiffs' theory of fraud presumes that EA released what the Complaint alleges was a "massively defective" flagship product "plagued by game-breaking defects" (CC ¶¶ 14-15) into the intensely competitive video game market, knowing or suspecting that it was defective; and, equally important, that EA's most senior executives participated in the scheme.  That predicate could not give rise to even a "reasonable" inference of fraud, which, as *Tellabs* makes clear, would be insufficient in any event.  *See* 551 U.S. at 324 (inference of fraud "must be more than 'reasonable'" to be "cogent and compelling").

According to the Complaint, "by the beginning of the Class Period, Defendants knew that: "(1) Battlefield 4 would provide a significant amount of EA's future revenues and profits; (2) Battlefield 4 would need to launch successfully with next-generation consoles; (3) EA had numerous problems launching games successfully in the past; and (4) investors were concerned about whether the Company's past problems launching games would continue with Battlefield 4." CC ¶ 60.  In evaluating inferences under Section 10(b), courts "assume that the defendant is acting in his or her informed economic self-interest."  *Shields*, 25 F.3d at 1130.  Yet deliberately launching what Plaintiffs describe as a "disastrous product" would be monumentally self-destructive under the circumstances alleged in the Complaint.  Intentionally making false or deliberately reckless statements about the product prior to the launch would only amplify the self-inflicted injury.

### 2.     The Complaints' Fatal Deficiencies Are Underscored By *Tellabs'* Weighing Analysis

The Complaint's failure to allege a strong, cogent and compelling inference of fraud is even clearer when examined under the "inherently comparative" weighing analysis prescribed by *Tellabs*.  551 U.S. at 323-24.  In addition to being predicated on an irrational theory of fraud, the Complaint is devoid of "confidential witness" allegations or references to internal reports, documents, meetings, or discussions contradicting any public statements or indicating that any

1   Defendant acted with scienter in making them.  *See* pp. 17-20, *supra*.  Accordingly, the facts

2   supporting an inference of fraudulent intent are negligible at best.

3        Conversely, the "non-culpable" inferences, explanations and supporting facts are

4   compelling, and *far* outweigh any possible inference of fraudulent intent.  As the Complaint and

5   documents it cites make clear, the information available prior to launch (including awards,

6   reviews, pre-orders, and extensive beta testing that revealed no significant technical problems)

7   indicated that *BF4* was *not* "massively defective" or afflicted with "game-breaking" bugs, as

8   Plaintiffs allege.  *See* pp. 4-5, *supra*; Ex. H at 1.  Nor is it uncommon, as this Court and many

9   others have recognized, for companies to release complex products that experience unforeseen

10  technical problems, without engaging in securities fraud.  "Honest optimism followed by

11  disappointment is not the same as lying or misleading with deliberate recklessness."  *Ronconi v.*

12  *Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).

13       When these factors and the irrationality of Plaintiffs' fraud theory are considered together,

14  the *only* plausible explanation for what occurred is that Defendants were unaware of significant

15  technical problems prior to *BF4*'s launch.  The competing inference—that Defendants knew or

16  suspected that *BF4* was plagued with devastating technical defects but released it anyway, *and*

17  intentionally or with deliberate recklessness made false statements in the process—is illogical and

18  unsustainable.

19       **E.**    **Defendants' Stock Sales Do Not Provide A Strong Inference Of Scienter**

20       Plaintiffs' failure to allege a strong inference of fraudulent intent in conformance with the

21  Reform Act and controlling case law renders their stock sale allegations (CC ¶¶ 123-26)

22  irrelevant, because "stock sales alone cannot create a strong inference of scienter."  *Wenger v.*

23  *Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998).  In any event, the stock sales provide

24  no support for an inference of scienter.

25       There is nothing inherently suspicious about corporate executives selling stock in their

26  companies.  Such sales are expected because stock awards are typically a significant part of their

27  compensation as employees.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424

28  (3d Cir. 1997).  Stock sales provide circumstantial evidence of scienter only when they are

1    "dramatically out of line with prior trading practices at times calculated to maximize the personal

2    benefit from undisclosed inside information."  *In re Silicon Graphics,* 183 F.3d at 986 (quotations

3    omitted).  Factors relevant to the determination of whether stock sales meet this standard include:

4    "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and

5    (3) whether the sales were consistent with the insider's prior trading history."  *Id.*  When these

6    factors are considered, the stock sales alleged in the Complaint point nowhere near an inference

7    of fraud.

8         As a group, the individual Defendants retained 2,719,575, or 77%, of their available

9    shares during the alleged class period.  *See* RJN at 4-7.  By retaining 2,719,575 shares, the

10   individual Defendants "lost" $18,982,633.[10]  The only rational inference to be drawn from that

11   fact is that they were not engaged in a fraudulent scheme to inflate EA's stock price or reap

12   profits from such purported inflation.  *See, e.g.*, *FormFactor I*, 2008 WL 2951275, at *10 (stock

13   sales did not support scienter inference where defendants "as a group" retained most of their

14   holdings).[11]

15        Nor is the timing of the stock sales suspicious.  All of the sales occurred within several

16   weeks following the release of quarterly results.  *See* CC ¶¶ 123, 137-39.  As the Ninth Circuit

17   cases recognize, "[o]fficers of publicly traded companies commonly make stock transactions

18   following the public release of quarterly earnings and related financial disclosures."  *Lipton v.*

19   *Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002).  Thus, "an insider's sale of stock after

20

21

22   _____
      [10] This potential loss was calculated by multiplying the difference ($6.98) between the share
      price at the class period high ($27.99) and the closing price the day after the end of the alleged
23   class period ($21.01) by the holdings retained by each individual Defendant.  By not taking into
      account the fact that nearly half of the shares that were sold by the individual Defendants were
24   acquired via the exercise of stock options (which obviously costs money), the Complaint
      overstates the net proceeds that they collectively received from the stock sales *by 43%.  Compare*
25   CC ¶ 123, *with* RJN at 4-7.

26    [11] *See also Osher v. JNI Corp.*, 302 F. Supp. 2d 1145, 1166 (S.D. Cal. 2003) ("Plaintiffs
      emphasize that Defendants sold 38% of the stock they actually owned" but "this necessarily
      means that Defendants *retained* 62% of their holdings.  This undermines Plaintiffs' allegation that
27   Defendants were quietly trying to unload their JNI stock."); *In re Vantive Corp. Sec. Litig.*, 110 F.
      Supp. 2d 1209, 1219 (N.D. Cal. 2000) (stock sales did not support scienter inference where
28   defendants as a group retained 62% of holdings), *aff'd*, 283 F.3d 1079 (9th Cir. 2002).

announcement of positive quarterly results" does not support an inference of scienter.  *In re IMPAX Labs. Sec. Litig.*, 2006 WL 6361942, at *8 (N.D. Cal. Mar. 1, 2006).[12]

An examination of each individual Defendant's stock sales is also exculpatory:

While Mr. Wilson sold 85% of his holdings in the summer of 2013 (CC ¶ 123), he sold 99.6% of his available stock in the summer of 2012 (Ex. S), and thus his class period sales were not "dramatically out of line with prior trading practices."  *Silicon Graphics*, 183 F.3d at 986; *see also Metzler*, 540 F.3d at 1067 (defendant's sales constituting 100% of holdings did not raise scienter inference since trading was consistent with pre-class period sales); *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1195 (S.D. Cal. 2004) (defendant's sales constituting 98.48% of holdings did not raise scienter inference because she "sold 100% of her available stocks" before the class period), *aff'd in relevant part*, 184 F. App'x 604, 605 (9th Cir. 2006).[13]

Moreover, Mr. Wilson held far fewer shares than any other Defendant who sold stock (RJN at 5-7), and all of his stock sales occurred in May and July 2013 (CC ¶ 123)—i.e., months before he was appointed CEO and is alleged to have made any false or misleading statements (CC ¶¶ 21, 82, 84).  *See In re Vantive*, 283 F.3d at 1094 (fact that defendant who sold 74% of his shares did not make any statements when selling undercut scienter inference).  The Complaint alleges no facts whatsoever to suggest that Mr. Wilson—or any other individual Defendant—was operating on inside information relating to *BF4* when he sold his shares.  Indeed, at the time of his stock sales, Mr. Wilson was EVP of EA SPORTS (CC ¶ 21), a division completely separate

---

[12] *See, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2013 WL 6441843, at *14 (N.D. Cal. Dec. 9, 2013); *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 950 (N.D. Cal. 2010); *Brodsky*, 630 F. Supp. 2d at 1118; *In re Tibco Software, Inc. Sec. Litig.*, 2006 WL 1469654, at *20 (N.D. Cal. May 25, 2006); *In re Netopia, Inc. Sec. Litig.*, 2005 WL 3445631, at *7 (N.D. Cal. Dec. 15, 2005); *In re Vantive*, 110 F. Supp. 2d at 1219.

[13] The Complaint makes much ado about the fact that, according to their Form 4s, Messrs. Wilson's and Söderlund's class period sales constituted 74% and 41% respectively of all shares of EA stock that they sold since January 1, 2008.  CC ¶ 125.  But Messrs. Wilson and Söderlund did not become Section 16 reporting officers required to file Form 4s until *April 2012*.  Ex. OO. In other words, Plaintiffs are engaging in pure speculation with respect to the trading histories of those two Defendants, which the Ninth Circuit has held will not do.  *See Zucco*, 552 F.3d at 1005 ("Even if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history.").

1   from the studio that developed *BF4*. *See In re Silicon Graphics*, 183 F.3d at 987-88. As Judge

2   Breyer held in a case involving similar circumstances:

> Defendant Nielsen did sell what appears to be a "suspicious" amount of stock:
> 92% of his holdings. Nielson, however, held far fewer shares than any other
> defendant. . . . Moreover, his position—Vice President of FVC's Business
> Access Unit—does not in and of itself suggest that he would be aware of the
> alleged false statements in the January 1999 press releases and, as is the case with
> the other defendants, the Complaint is wholly lacking in any allegations that
> suggest Nielson had any knowledge of any alleged false statements. . . . In sum,
> the selling of a high percentage of shares by a Vice President cannot—without
> more—support an inference of scienter let alone a strong inference.

8   *In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000) (citing *In re Silicon*

9   *Graphics*, 183 F.3d at 987), *aff'd*, 32 F. App'x 338 (9th Cir. 2002).

10      Mr. Moore sold only 25% of his available holdings (RJN at 5)—not 36% as alleged in the

11   Complaint—which is insufficient as a matter of law to support an inference of scienter. *See*

12   *Metzler*, 540 F.3d at 1067 (refusing to infer scienter where defendant "sold only 37% of his total

13   stock holdings"). Messrs. Gibeau (48%) and Söderlund (44%) both retained a majority of their

14   holdings (RJN at 6), and "thus, potentially would suffer the same losses as other investors when

15   the value of [EA's] stock dropped." *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142,

16   1160 (C.D. Cal. 2007); *see, e.g.*, *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 1000 (D.

17   Ariz. 1999). Furthermore, Mr. Söderlund is not alleged to have made *any* false or misleading

18   statement, *see Vantive*, 283 F.3d at 1094; *In re Silicon Graphics*, 183 F.3d at 987-88, and he

19   actually sold more shares in the year *before* the class period than during the class period itself

20   (CC ¶¶ 123-24), *see, e.g.*, *In re Tibco*, 2006 WL 1469654, at *20.

21      Finally, had Messrs. Wilson, Moore, Gibeau, and Söderlund "been selling the[ir] shares to

22   'dump' what [they] knew was artificially inflated stock"—they were not—"other equally (or

23   more) knowledgeable defendants presumably would have done the same thing." *In re Vantive*,

24   283 F.3d at 1093. Yet Mr. Probst, EA's CEO for most of the alleged class period and by far the

25   largest EA shareholder among the Defendants (and thus the one with the most to gain *and* lose),

26   and Mr. Jorgensen, EA's CFO (CC ¶¶ 22-23), *did not sell a single share*. The fact that Messrs.

27   Probst and Jorgensen, who would have been essential participants in any fraudulent scheme, did

28   not sell any stock negates any inference of scienter arising from the other Defendants' stock sales.

1   *See, e.g.*, *In re FVC.com*, 136 F. Supp. 2d at 1039; *Gaylinn v. 3Com Corp.*, 185 F. Supp. 2d 1054,

2   1067 (N.D. Cal. 2000); *Metzler*, 540 F.3d at 1067; *In re Vantive*, 283 F.3d at 1093.[14]

3   <u>**CONCLUSION**</u>

4   For the foregoing reasons, the Complaint should be dismissed.[15]

5

6   Dated: June 9, 2014                  ORRICK, HERRINGTON & SUTCLIFFE LLP

7                                        _____
                                              */s/ Robert P. Varian*
8                                             Robert P. Varian
                                              Attorneys for Defendants
9                                 Electronic Arts, Inc., Andrew Wilson, Lawrence F.
                                  Probst III, Blake J. Jorgensen, Peter Robert Moore,
10                                   Frank D. Gibeau, and Patrick Söderlund

11

12

13

14

15

16

17

18

19

20

21

22

---

23   [14] Perhaps because they recognize that the individual Defendants' stock sales during the
24   alleged class period do not support any inference of scienter, Plaintiffs also allege stock sales by
     other EA employees who are not named as defendants.  CC ¶ 126.  But as numerous courts in this
25   District have held, "[s]ales by insiders not named as defendants . . . are irrelevant to the
     determination of the named defendant's scienter."  *Wozniak*, 2011 WL 2269418, at *14; *In re
26   Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *7 n.6 (N.D. Cal. Mar. 11, 2011); *In re
     Rackable Sys., Inc. Sec. Litig.*, 2010 WL 1997703, at *9 (N.D. Cal. Jan. 13, 2010); *In re Lexar
27   Media, Inc. Sec. Litig.*, 2005 WL 1566534, at *6 n.1 (N.D. Cal. July 5, 2005).

     [15] Because Plaintiffs fail to plead a primary violation of Section 10(b), they also fail to plead a
28   claim for control person liability under Section 20(a).  *See Rudolph*, 560 F. Supp. 2d at 892-93.

MEMO OF  POINTS & AUTHORITIES IN SUPPORT
                                         OF DEFENDANTS' MTD - (MASTER FILE NO. 3:13-
                                         CV-05837-SI)