1

2

3

4

5

6

7

8                                    IN THE UNITED STATES DISTRICT COURT

9                                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   RYAN KELLY and LOUIS MASTRO,                     No. C 13-05837 SI
     Individually and on Behalf of All Others
12   Similarly Situated,                              **ORDER GRANTING DEFENDANTS'**
                                                      **MOTION TO DISMISS PLAINTIFFS'**
13              Plaintiffs,                            **CONSOLIDATED CLASS ACTION**
                                                      **COMPLAINT WITH LEAVE TO AMEND**
14        v.

15   ELECTRONIC ARTS, INC., et al.,

16              Defendants.
                                               /
17

18        Now before the Court is defendants' motion to dismiss plaintiffs' Consolidated Class Action

19   Complaint.  For the reasons set forth below, the Court GRANTS defendants' motion to dismiss, with

20   leave to amend.

21

22                                          **BACKGROUND**[1]

23        This is a securities fraud class action against defendant Electronic Arts, Inc. ("EA") and certain

24   of its officers and executives[2] under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

25

26        [1]  The following background facts are taken from the allegations in the Consolidated Class
     Action Complaint ("Complaint" or "Compl."), which for purposes of this motion, must be taken as true.
27

28        [2]  The individual defendants are: Chief Executive Officer and Director Andrew Wilson;
     Chairman and, during part of the class period, Executive Chairman Lawrence F. Probst III; Chief
     Financial Officer and Executive Vice President Blake J. Jorgensen; Chief Operating Officer Peter
     Robert Moore; President of EA Labels Frank D. Gibeau; and Executive Vice President of EA Studios
     Patrick Söderlund.  Compl. ¶ 1.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

and corresponding SEC Rule 10b-5. Compl. ¶¶ 1, 157. Lead plaintiffs Ryan Kelly and Louis Mastro bring suit on behalf of all persons who purchased EA common stock between May 8, 2013 and December 5, 2013 ("class period"). *Id.* ¶¶ 1, 19.

## I.    EA's *Battlefield 4* ("BF4")

EA is a multinational developer, marketer, and distributor of video games. *Id.* ¶ 28. EA is currently the world's third-largest gaming company after Nintendo and Activision. *Id.* Since its founding, EA has released a diverse portfolio of successful video games, including *FIFA*, *Madden*, *NBA Live*, and *Battlefield*. *Id.* ¶¶ 28-29; Defendants' Request for Judicial Notice ("RJN"), Ex. F at 6.[3] *FIFA* and *Battlefield* are two of EA's "blockbuster" and most "lucrative" video game franchises. Compl. ¶¶ 29, 33-34. During the class period, EA planned to release approximately twenty-six games, including a "slate of games" available on next-generation gaming consoles. *Id.* ¶ 73; Defendants' RJN, Ex. C at 4. *Battlefield 4* ("BF4"), one of the video games central to this action, launched in October and November 2013. Compl. ¶¶ 12-13, 82.

EA owns and operates several video game development studios, including DICE studios. *Id.* ¶ 29. DICE developed *Battlefield 4* using a technology platform known as Frostbite 3. *Id.* ¶¶ 29, 78. Frostbite 3 underlies the versions of BF4 available for both existing and next-generation gaming consoles. *Id.* ¶ 78; Defendants' RJN, Ex. A.

EA expected BF4 to generate a significant portion of EA's total revenue in 2013 and 2014. Compl. ¶¶ 34-36. The prior version of BF4, *Battlefield 3*, accounted for approximately 11% of EA's total revenue in fiscal year 2012. *See* Defendants' RJN, Ex. ¶ at 6.[4] On January 30, 2013, EA's former CEO acknowledged that "*FIFA* and *Battlefield* are vitally important to [EA]." Compl. ¶¶ 33, 35.

---

[3]  Plaintiffs do not object to judicial notice of Ex. F (transcript of EA's earnings call). *See* Plaintiffs' Opposition to Defendants' RJN at 2. Accordingly, the Court takes judicial notice of Ex. F. For the same reason, the Court also takes judicial notice of Ex. C (transcript of EA's earnings call), Ex. A (interview with Defendant Patrick Söderlund), and Ex. VV (Lead Plaintiffs' certifications pursuant to 15 U.S.C. § 78u-4(a)).

[4]  Plaintiffs object to Ex. PP (excerpts of EA's SEC Form 10-K). "In a securities fraud action, the court may take judicial notice of public records outside the pleadings, including SEC filings." *In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 341 (N.D. Cal. 2000) (citation omitted). Accordingly, the Court takes judicial notice of Ex. PP.

Similarly, a January 2013 report noted that "[w]ith a portfolio of strong franchises and key upcoming catalysts that include next-gen consoles and *Battlefield 4*, we anticipate strong profitable growth for [EA] in [fiscal year] 2014." *Id.* ¶ 36.

Key to BF4's importance was its role in facilitating EA's transition to next-generation gaming consoles. *Id.* ¶ 60. On May 21, 2013, EA confirmed that BF4 would be available on two next-generation gaming consoles, Sony PlayStation 4 and Microsoft Xbox One, as soon as those consoles became available. *Id.* ¶ 66. However, EA investors were skeptical about EA's ability to launch BF4 without significant problems in light of EA's history of "disastrous" game-launch and console-transition failures. *Id.* ¶¶ 40, 58, 60.

**II.    BF4's Launch**

Before its official launch, BF4 received positive reviews during EA's live demonstrations at video gaming conferences. *Id.* ¶¶ 55-57. For example, on March 26, 2013, one reviewer "lauded" EA's live demonstration of BF4 and characterized BF4 as "so important that it could make a difference for EA's valuation in the stock market." *Id.* ¶ 56. In June 2013, EA's live demonstration of BF4 on Microsoft's Xbox One next-generation gaming console at the Electronic Entertainment Expo ("E3") similarly "garnered the biggest reaction" at the event and received twenty-one awards. *Id.* ¶¶ 68, 70. On July 23, 2013, defendant Moore confirmed that ". . . we are actually seeing strong preorders [sic] for *Battlefield 4*. . . ." *Id.* ¶¶ 70-71.

Beginning in Fall 2013, EA employees discussed some of the challenges facing BF4's development. In an October 17, 2013 interview, BF4 Executive Producer Patrick Bach explained that BF4 was "a really complicated" game developed across five separate platforms, including two next-generation gaming consoles which were not finalized for the majority of BF4's development. *Id.* ¶ 79. Bach explained that it was difficult to "develop a game at the same time as the [next-generation gaming consoles]. We've been struggling quite a lot to keep up with the changes we've seen – both sides need to adapt and you end up being late." *Id.* ¶ 80. Bach also admitted that ". . . there are times when we've considered [delaying the game's release] – luckily we've overcome those hurdles. . . ." *Id.*

Bach further noted that EA had beta-tested BF4 on existing consoles and that the feedback was "huge." *Id.* ¶ 81.

A DICE developer who worked on BF4 echoed Bach's sentiments. *Id.* ¶ 94. In a November 6, 2013 email, the DICE developer explained that EA "always wants more and more in the game until the very end of the project which puts an enormous strain on QA to test everything. . . [but we] do test EVERYTHING we really do. . . ." *Id.* He also indicated that testing for defects took a long time and suggested that DICE might not test BF4 after every programming update. *Id.* In addition, on December 20, 2013, another BF4 game developer stated that Frostbite 3 had been used to develop high-risk game code for BF4 that made BF4 more likely to crash and suffer timing risks in comparison to prior versions. *Id.* ¶¶ 78(a), 114-16. He also noted that EA wanted to "use the [next-generation gaming consoles] better by squeezing out the maximum capacity" of the next-generation gaming consoles. *Id.* ¶ 114.

EA officially launched BF4 in a series of three rollouts: (1) BF4 launched on three existing gaming consoles on October 29, 2013 (*Id.* ¶¶ 12, 82); (2) BF4 launched on Sony's PlayStation 4 next-generation gaming console on November 15, 2013 (*Id.* ¶ 13); and (3) BF4 launched on Microsoft's Xbox One next-generation gaming console on November 22, 2013 (*Id.* ¶ 13).

BF4's launch was met by "a deluge of customer complaints regarding game-breaking issues." *Id.* ¶¶ 90-92. On October 29, 2013 or "immediately thereafter," [5] customers complained about BF4's performance on existing consoles, stating that the "[g]ame won't even start" and "[t]he random freezing/crashing is making [BF4] unplayable." *Id.* ¶ 91. On October 30, 2013, one game reviewer, who had early access to the next-generation version of BF4, published a review in which he described a "game-crashing" error. *Id.* ¶ 93. Similarly, after the next-generation launches on November 15, 2013 and November 22, 2013, customers described multiple defects. *Id.* ¶¶ 96-98. For instance, customers complained that "I can't play at all" and noted "[l]ots of crashes when trying to load the game." *Id.* ¶ 96. On December 4, 2013, a reporter stated that he found it "hard to believe that the issues facing *Battlefield 4* were a surprise to EA and DICE." *Id.* ¶ 109.

---

[5] The complaint does not identify which customer comments were made on October 29, 2013 and which were made "immediately thereafter." *Id.* ¶¶ 91-92.

4

1    In response, on December 4, 2013, EA announced that DICE would cease development on any

2    future projects until it had fixed BF4's defects, which took approximately three months. *Id.* ¶¶ 106, 119.

3    On December 10, 2013, DICE publically released its "*Battlefield 4* Top Issues Tracker," which listed

4    BF4's defects as of that day. *Id.* ¶¶ 112-13.[6]

5

6    ### III.    Purported Misstatements

7    The complaint alleges that during the class period, Defendants Gibeau, Jorgensen, Moore, and

8    Wilson[7] made the following eight[8] materially false or misleading statements about BF4:

9        (1) During a May 7, 2013 earnings conference call with analysts and investors, defendant
        Gibeau responded to a question about EA's prior gaming console transitions by stating:
10       ". . . in comparison to last transition, we're in a much better state as a company in terms
        of our development. . . . [O]ur investment in Frostbite and EA SPORTS over the last
11       year has really put us in a position where the technology side or the engine side of this
        transition has largely been de-risked." *Id.* ¶ 62.

12       (2) During a June 12, 2013 investor breakfast, defendant Moore responded to a question
13       about EA's prior gaming console transitions by stating: ". . . we learned from [the last
        transition], and for this cycle, we have started early on Ignite and on Frostbite 3, and
14       derisk the technology engine component of making the transition.  So from the
        standpoint of picking the wrong platforms, I think we did a good job there but we've
15       mismanaged the technology.  That's not happening this time around." *Id.* ¶ 69.

16       (3) In an interview published on July 23, 2013, defendant Gibeau responded to a
        question about Frostbite by stating: "We created two technology paths [Frostbite and
17       Ignite] and invested early. . . . [W]e wanted to de-risk the technology piece as much as
        possible.  That was the key learning. . . .  I was not going to repeat that mistake. . . .
18       Frostbite has been the core difference.  When you have a proven technology base with
        tools that work. . . it makes for efficient and low-risk development." *Id.* ¶¶ 73-74.

19
20       (4) During an October 29, 2013 earnings conference call, defendant Jorgensen stated:
        "Q3 represents more than 40% of our total non-GAAP revenue, and 98% of our annual
21       EPS.  Similar to the World Series, where the remaining game or two will determine the
        season for Peter Moore's beloved Boston Red Sox, the next few months will determine
22       the success of our fiscal year.  Our team is battle-tested and ready, and today, we are
        sending our ace, *Battlefield 4*, to the mound." *Id.* ¶¶ 82-83.

23

24    _____

25       [6]  The Court will not consider Defendant Wilson's statements from a June 2014 interview
     admitting that BF4 was built on an "unfinished platform" (*See* Plaintiffs' Opposition at 10 ) because this
26    interview was not alleged in the complaint, as it post-dates the complaint by two months.

27       [7]  Plaintiffs are inconsistent as to whether they assert a Section 10(b) claim against defendants
     Probst and Söderlund.  *Compare* Plaintiffs' Opposition at 1 n.1 *with* Complaint ¶¶ 1, 154.

28       [8]  Defendants incorrectly refer to nine purported misstatements.  *See* Defendants' Opening
     Memorandum at 8.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

(5) During the same October 29, 2013 earnings conference call, defendant Wilson responded to a question about the impact of next-generation gaming consoles on EA's vision for the future by stating: ". . . coming out of the last transition, we were resolute in our desire to ensure we didn't have that kind of challenge again.  So as we approach this transition, I would say we started work earlier than we ever had done before, and we worked more closely with both Microsoft and Sony throughout the entire process, and the end result is, we have a launch slate of games that are the best transition games that I've ever seen come out of this Company. . . .  I think we are starting this console generation far stronger than we've done before. . . ."  *Id.* ¶¶ 82, 84.

(6) During the same October 29, 2013 earnings conference call, defendant Moore responded to a question about the significance of next-generation gaming consoles for EA games like BF4 by stating: "We've not had some of the problems some of our fellow publishers in the industry have in getting our quality titles ready for next gen.  We feel, as we have said on previous earning calls, we're well ahead of this transition, and we're going to nail it."  *Id.*  ¶¶ 82, 85.

(7) During the same October 29, 2013 earnings conference call, defendant Wilson responded to a question about the impact of next-generation gaming consoles on upcoming EA games by stating: "[W]hen you look at the success of a console generation, it's the combination of two things.  Great consoles and great software.  And as I talked about earlier, I think that our launch software this time is head and shoulders above where we were last time. . . . [W]e are certainly bullish as we come into this platform generation, particularly as well as we have executed."  *Id.* ¶¶ 82, 86.

(8) During a December 3, 2013 presentation at a technology conference, defendant Wilson responded to a question about the impact of next-generation software on *FIFA* and *Battlefield* by stating: "So the good news now is I think that we have reached a level of quality at launch that we didn't get to last time, and our teams are already starting to think about investment in new innovation for the future."  *Id.* ¶ 103.

The complaint alleges that the May 7, 2013, June 12, 2013, and July 23, 2013 statements "perpetuat[ed] the misleading impression that, in preparation for the development of *Battlefield 4* and games for the next-generation gaming consoles, EA had 'de-risked' the technology problems that had caused past botched game launches and console transitions."  *Id.* ¶ 3.  The complaint further alleges that the October 29, 2013 statements created the false impression that EA had successfully launched BF4 on existing platforms and was prepared to launch BF4 successfully on next-generation gaming consoles.  *Id.* ¶ 90.  In addition, plaintiffs claim that the December 3, 2013 statement allegedly gave investors the false impression that EA's development teams were thinking about future innovations.  *Id.* ¶ 3.

Defendants allegedly made these statements in order to sell their EA stock at artificially inflated prices.  *Id.* ¶ 14.  The purported misstatements allegedly caused EA's stock to trade at artificially high levels, reaching a class period high of $27.99 per share on September 4, 2013.  *Id.* ¶¶ 14, 137.  Lead plaintiffs made their final EA stock purchase during the alleged class period on October 16, 2013.  *See* Defendants' RJN, Ex. VV.  After EA launched BF4 on the two next-generation gaming consoles, EA's

6

stock price dropped to $21.01 per share on December 5, 2013, thus removing the artificial inflation. Compl. ¶¶ 95, 102, 142.  During the class period, defendants Wilson, Moore, Gibeau, and Söderlund sold 816, 959 shares for a total of $19,867,347.  *Id.* ¶ 123.  As a group, defendants retained 77% of their available shares during the class period.  *See* Defendants' RJN at 4.  Individually, these defendants' class period stock sales represented 74%, 74%, 85%, and 41%, respectively, of their total individual EA stock sold between January 1, 2008 and December 5, 2013.  Compl. ¶ 125.

In addition, defendants allegedly misrepresented facts about BF4 in order to drive BF4 pre-sales, beat Activision's *Call of Duty* to market, and launch with the next-generation gaming consoles in time for the holiday season.  *Id.* ¶¶ 7, 63, 71-72, 79-80, 94.  In a December 4, 2013 *Forbes* article, the article's author stated, "I suspect that EA didn't want to hand victory over to Activision and *Call of Duty: Ghosts* by delaying the game. . . ."  *Id.* ¶ 108.  In addition, a November 6, 2013 email from a DICE developer stated that ". . . EA [ ] wants us to release 2 weeks before [Activision's *Call of Duty*] to avoid competition."  *Id.* ¶ 94.

**IV.    Procedural Background**

In late 2013 and early 2014, plaintiffs instituted two actions against Defendants: *Kelly v. Electronic Arts, Inc.*, No. 13-05837, and *Mastro v. Electronic Arts, Inc.*, No. 14-00188.  *See* Dkt. No. 16.  By order dated January 22, 2014, the Court consolidated these actions into the present case, *In re Electronic Arts, Inc. Sec. Litig.*, No. 13-05837.  *See* Dkt. No. 13.  On February 25, 2014, the Court designated Ryan Kelly and Louis Mastro as lead plaintiffs and appointed lead class counsel.  *See* Dkt. No. 16.

Presently before the Court is defendants' motion to dismiss the Complaint.

## LEGAL STANDARD

**I.    Federal Rule of Civil Procedure 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that

add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In deciding whether a plaintiff has stated a claim upon which relief can be granted, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses a complaint, it must then decide whether to grant leave to amend.  The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## II.     The Securities Exchange Act of 1934

Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary. . . ." 15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements Section 10(b) by making it unlawful to make any untrue statement of material fact necessary in order to make the statements made not misleading.  17 C.F.R. § 240.10b-5.

A plaintiff asserting a claim under Section 10(b) or Rule 10b-5 must adequately allege six elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citation omitted); *In re NVIDIA Corp. Sec. Litig.*, No. 11-17708, ___ F.3d ___, 2014 WL 4922264, at *4 (9th Cir. Oct. 2, 2014).

United States District Court
For the Northern District of California

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a Section 10(b) complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009) (citation omitted). As to falsity, the complaint must state with particularity each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1); *In re Daou Sys.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citation omitted). As to scienter, the complaint must state with particularity facts giving rise to a strong inference that the defendant made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C. § 78u-4(b)(2); *In re Daou Sys.*, 411 F.3d at 1015.

Section 20(a) of the Securities Exchange Act of 1934 imposes liability on "control persons." 15 U.S.C. § 78t(a). To establish liability under Section 20(a), a plaintiff must first prove a primary violation of Section 10(b) or Rule 10b-5. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

## DISCUSSION

Defendants move to dismiss plaintiffs' Section 10(b) and Rule 10b-5 claim on the basis that the complaint fails to adequately allege any actionable misstatements. In addition, defendants contend that the complaint fails to plead with particularity both falsity and scienter.[9] As to plaintiffs' Section 20(a) claim, defendants move to dismiss on the ground that the complaint fails to adequately allege a primary violation under Section 10(b) or Rule 10b-5.

### I.    Inactionable Statements

#### A.    Post-Purchase Statements

Defendants contend that five of the eight purported misstatements are inactionable as a matter of law because defendants made these statements after lead plaintiffs purchased their EA common stock. Statements issued after a plaintiff's purchase of stock cannot form the basis of a Section 10(b) or Rule 10b-5 claim because the statements could not have affected the plaintiff's decision to purchase stock.

---

[9] Defendants do not contest plaintiffs' allegations regarding certain other elements of a Section 10(b) claim, including loss causation.

United States District Court
For the Northern District of California

*Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992) (finding on summary judgment that "[w]e need not determine whether this statement is misleading [under Section 10(b) or Rule 10b-5] because it was issued after [the plaintiff] bought his stock and thus could not have affected. . . his decision to buy on that date.") (citation omitted).

Here, lead plaintiffs made their final EA stock purchase on October 16, 2013.  *See* Defendants' RJN, Ex. VV.  However, defendants made five of the purported misstatements several days later on October 29, 2013 and December 3, 2013.  Compl.  ¶  82-86, 103.  Accordingly, the five purported misstatements made on October 29, 2013 and December 3, 2013 are inactionable as a matter of law because they post-date lead plaintiffs' purchase of EA stock.  *See Hanon*, 976 F.2d at 501.

Plaintiffs concede that lead plaintiffs made their final stock purchase before the October 29, 2013 and December 3, 2013 statements, but rely on this Court's decision in *In re Connetics Corp. Securities Litigation*, 542 F. Supp. 2d 996 (N.D. Cal. 2008), to argue that the post-purchase statements are nevertheless actionable.  In *In re Connetics*, this Court found that a lead plaintiff in a Section 10(b) class action established Article III standing even though he established individual standing only as to some, but not all, claimed injuries of the class.  As the Court explained, ". . . a lead plaintiff with some injuries in fact has established standing for purposes of Article III; once the general standing requirement is satisfied [for a lead plaintiff], any additional questions related to particular injuries are relevant only in the context of class certification under Federal Rule of Civil Procedure 23." *Id.* at 1004.  Plaintiffs rely on this line of reasoning to argue that if lead plaintiffs have standing to assert a claim based on their purchase of stock before some, but not all, of the purported misstatements, then they have standing as to all class members at the pleading stage.

Plaintiffs' reliance on *In re Connetics* is misplaced.  *In re Connetics* involved a lead plaintiff who sold stock before the disclosure of truthful information.  Accordingly, the issue was whether the lead plaintiff's pre-disclosure stock purchase gave rise to an Article III injury-in-fact.  *Id.* at 1002-1004. In contrast, here the lead plaintiffs purchased EA stock before defendants issued five of the alleged misstatements.  Therefore, the issue here is whether lead plaintiffs could have relied on defendants' October 29, 2013 and December 3, 2013 statements if they purchased their EA stock on October 16, 2013.  As a matter of law, "conduct actionable under Rule 10b-5 must occur before investors purchase

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1  the securities." *Binder v. Gillespie*, 184 F.3d 1059, 1066 (9th Cir. 1999) (citation omitted); *see*

2  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (". . . [a] plaintiff must demonstrate standing

3  for each claim he seeks to press.") (citation omitted). Because lead plaintiffs cannot plead Section 10(b)

4  reliance as to the five purported misstatements that post-date their EA stock purchase, those statements

5  are inactionable as a matter of law.[10] *See Binder*, 184 F.3d at 1059, 1066.

6       Accordingly, the Court DISMISSES plaintiffs' Section 10(b) claim to the extent it relies on

7  purported misstatements made on October 29, 2013 and December 3, 2013. The Court grants plaintiffs

8  leave to amend to allege statements made before lead plaintiffs' stock purchase or to substitute new lead

9  plaintiffs.

10

11       **B.       Statements of Opinion, Corporate Optimism, and Puffery**

12       Defendants also contend that all of the purported misstatements are inactionable as a matter of

13  law because they constitute vague expressions of opinion, corporate optimism, or puffery. "'[V]ague,

14  generalized, and unspecific assertions' of corporate optimism or statements of 'mere puffing' cannot

15  state actionable material misstatements of fact under federal securities laws." *In re Cornerstone*

16  *Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (citation omitted). A projection

17  of optimism or statement of belief is a "factual" misstatement actionable under Section 10(b) if: (1) the

18  statement is not actually believed; (2) there is no reasonable basis for the belief; or (3) the speaker is

19  aware of undisclosed facts tending seriously to undermine the statement's accuracy. *Kaplan v. Rose*,

20  49 F.3d 1363, 1375 (9th Cir. 1994) (citations omitted).

21       Plaintiffs argue that the purported misstatements are actionable in light of the context in which

22  they were made. Plaintiffs contend that when viewed in context, defendants' purported misstatements

23  allegedly created the false impression that EA had "de-risked" the underlying technology of BF4 and

24  that EA was "battle-tested" and ready to launch BF4 on next-generation gaming consoles. Plaintiffs

25  argue that defendants' statements touting BF4 were particularly misleading because investors were

26  concerned about EA's prior history of "disastrous" game-launch and console-transition failures. Compl.

27

28       [10] Because the Court finds that five of the post-purchase statements are inactionable, the Court grants Plaintiffs' request to substitute new lead plaintiffs who purchased stock after October 29, 2013 and December 3, 2013.

¶¶ 40, 58, 60.  In addition, plaintiffs assert that EA investors paid particular attention to statements about BF4 and the next-generation console transition because BF4 was "vitally important" to EA's financial prospects.  *Id.* ¶¶ 33-36.  Plaintiffs further note that defendants' statements were made in response to questions about BF4 or the next-generation console transition.  *Id.* ¶¶ 62, 69, 84-86, 103.

The Court agrees with defendants that all of the purported misstatements are inactionable statements of opinion, corporate optimism, or puffery.  Defendant Gibeau's May 7, 2013 statement that EA was in a "much better state" for the next-generation transition and that Frostbite 3 had "largely been de-risked" is a non-actionable vague expression of corporate optimism and puffery upon which no reasonable investor would rely.  *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (statement that product line "improved" held inactionable as vague assessment of past results upon which no reasonable investor would rely); *Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 998-99 (N.D. Cal. 2007) (statements touting "high quality" and "reliable" service were non-actionable puffery that would not be likely to mislead a reasonable consumer).  For the same reasons, defendant Moore's June 12, 2013 statement that "this time around" EA did not pick the wrong technology platform and that EA had "derisk[ed]" Frostbite 3, along with defendant Gibeau's July 23, 2013 statement that "we wanted to de-risk" Frostbite 3 and that EA was "not going to repeat that mistake," are also inactionable.  *Id.*; *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008) ("well-positioned to succeed" inactionable as vague assertion of corporate optimism).

The October 29, 2013 and December 3, 2013 statements are also inactionable.  Defendant Jorgensen's October 29, 2013 statement comparing BF4 to a World Series ace pitcher is puffery.  *See Brodsky*, 592 F. Supp. 2d at 1200 ("on the technology front we hit the ball out of the park" held inactionable as vague assertion constituting mere puffery upon which no reasonable customer would rely).  Defendant Wilson's October 29, 2013 statement explaining that EA "worked more closely with Microsoft and Sony [the next-generation gaming console developers] throughout the entire process" resulting in a "launch slate of games that are the best transition games that I've ever seen come out of this Company" is an inactionable opinion, as well as a vague statement of corporate optimism.  *See In re Apple Computer, Inc. Sec. Litig.*, No. 03-16614, 127 F. App'x 296, 304 (9th Cir. 2005) (holding "this is going to be the best Power Mac ever" inactionable as plausibly held opinion and statement of

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

corporate optimism); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064, (N.D. Cal. 2012) ("product portfolio is robust" inactionable as corporate optimism); *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992) (". . . most amateur investors. . . know how to devalue the optimism of corporate executives. . . ."). Likewise, defendant Moore's October 29, 2013 statement proclaiming that "We feel . . . we're well ahead of this transition, and we're going to nail it" is also an inactionable statement of corporate optimism. *See In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-1568 SBA, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (statement that company was "extremely well positioned" held inactionable). For the same reasons, defendant Wilson's October 29, 2013 statement proclaiming that EA's launch software "[is] head and shoulders above where we were last time" and that EA "[is] certainly bullish as we come into this platform generation . . .", as well as his December 3, 2013 statement noting that EA's teams are already "starting to think about investment in new innovation for the future," are also inactionable. *Id.*

Accordingly, the Court DISMISSES plaintiffs' Section 10(b) claims with leave to amend to allege actionable misstatements.[11]

## II.    Falsity and Scienter

Defendants move to dismiss the complaint on the additional ground that the complaint fails to plead with particularity that defendants made materially false or misleading statements about BF4 intentionally or with deliberate recklessness. The Court agrees that the complaint fails to adequately allege falsity and scienter for the reasons articulated by defendants.

///

---

[11]   Defendants move to dismiss plaintiffs' Section 10(b) claim against defendants Probst and Söderlund on the additional ground that Plaintiffs do not allege that defendants Probst and Söderlund made any purported misstatements. *See Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1060 (N.D. Cal. 2013) (liability under Rule 10b-5 limited to parties who actually make misstatements). The Court agrees, to the extent plaintiffs assert a Section 10(b) claim against defendants Probst and Söderlund. Accordingly, the Court DISMISSES plaintiffs' Section 10(b) claim against defendants Probst and Söderlund with leave to amend.

**III.    Section 20(a)**

Defendants move to dismiss plaintiffs' claims for control person liability under Section 20(a) on the ground that the Complaint fails to allege a primary violation under Section 10(b) or Rule 10b-5. To establish liability under Section 20(a), a plaintiff must first prove a violation of Section 10(b) or Rule 10b-5. *Lipton*, 284 F.3d 1035 n.15. As discussed above, plaintiffs have not adequately alleged a primary violation of Section 10(b) or Rule 10b-5.

Accordingly, the Court GRANTS defendants' motion to dismiss the Section 20(a) claim with leave to amend to properly allege a primary violation under Section 10(b) and Rule 10b-5.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion to dismiss the Consolidated Class Action Complaint with leave to amend. The amended complaint must be filed no later than **November 3, 2014**. Additionally, the Court GRANTS defendants' request for judicial notice of Exhibits A, C, F, ¶, and VV attached to Defendants' Request for Judicial Notice. This order resolves Docket Nos. 26-27, 34-35, and 37-38.

**IT IS SO ORDERED.**

Dated: October 20, 2014

_____
SUSAN ILLSTON
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

14