United States District Court<br>
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RYAN KELLY, *et al*.,

          Plaintiffs,

    v.

ELECTRONIC ARTS, INC., *et al*.,

          Defendants.

Case No. 13-cv-05837-SI

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS'
AMENDED CONSOLIDATED
COMPLAINT WITHOUT LEAVE TO
AMEND**

Re: Dkt. No. 53

On April 24, 2015, the Court held a hearing on defendants' motion to dismiss plaintiffs' Amended Consolidated Complaint ("Amended Complaint" or "ACC"). Dkt. No. 53. For the reasons set forth below, the Court GRANTS defendants' motion to dismiss without leave to amend.

**BACKGROUND[1]**

This is a securities fraud class action against defendant Electronic Arts, Inc. ("EA") and certain of its officers and executives[2] under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and corresponding SEC Rule 10b-5. ACC ¶¶ 1, 147, 150. Lead plaintiffs Ryan Kelly and Louis Mastro bring suit on behalf of all persons who purchased EA common stock between

[1] The following background facts are taken from the allegations in the Amended Complaint and documents incorporated therein by reference, which for purposes of this motion, must be taken as true.

[2] The individual defendants are: Chief Executive Officer Andrew Wilson; Chief Financial Officer and Executive Vice President Blake J. Jorgensen; Chief Operating Officer Peter Robert Moore; and President of EA Labels Frank D. Gibeau. ACC ¶ 1. Plaintiffs no longer assert claims against Chairman Lawrence F. Probst III or Executive Vice President of EA Studios Patrick Söderlund. *Compare* Consolidated Class Action Complaint ("Compl.") ¶ 1, *with* ACC ¶ 1.

1    May 8, 2013 and December 5, 2013 ("class period").  *Id.* ¶¶ 1, 27.

2

3    **I.    EA's *Battlefield 4* ("BF4")**

4           EA is a multinational developer, marketer, and distributor of video games.  *Id.* ¶ 35.  EA is

5    currently the world's third-largest gaming company after Nintendo and Activision.  *Id.*  Since its

6    founding, EA has released a diverse portfolio of successful video games, including *FIFA*, *Madden*,

7    *NBA Live*, and *Battlefield*.  *Id.* ¶¶ 36-37; Defendants' Second Request for Judicial Notice ("Defs.'

8    SRJN"), Dkt. No. 55, Ex. E, at 6.[3]  *FIFA* and *Battlefield* are two of EA's "blockbuster" and most

9    "lucrative" video game franchises.  ACC ¶¶ 39-40.  During the class period, EA planned to

10   release approximately twenty-six games, including several which would be available on next-

11   generation gaming consoles.  Defs.' SRJN Ex. B, at 7-8.[4]  *Battlefield 4* ("BF4"), one of the video

12   games central to this action, launched in October and November 2013.  ACC ¶¶ 15-16.

13          EA owns and operates several video game development studios, including DICE studios.

14   *Id.* ¶ 36.  DICE developed *Battlefield 4* using a technology platform known as Frostbite 3, which

15   the studio also developed.  *Id.*  Frostbite 3 underlies the versions of BF4 available for both existing

16   and next-generation gaming consoles.  *Id.* ¶ 89.

17          EA expected BF4 to generate a significant portion of EA's total revenue in 2013 and 2014.

18   *Id.* ¶¶ 39-41.  The prior version of BF4, *Battlefield 3*, accounted for approximately 11 percent of

19   EA's total revenue in fiscal year 2012.  *See* Defs.' SRJN Ex. U, at 5.  On January 30, 2013, EA's

20   former CEO acknowledged that *FIFA* and *Battlefield* are "vitally important" to EA.  ACC ¶¶ 40.

21

22          [3] Plaintiffs do not object to judicial notice of Exhibits A-R.  *See* Pls.' Response to Request
     for Judicial Notice at 2-4.  The plaintiffs do, however, object to judicial notice of Exhibits S-W
23   (excerpts of EA's Form 10-K and several Forms 8-A filed with the SEC between January and
     October of 2014) and Exhibit X (Yahoo! Finance report of EA's stock prices between May 7,
24   2013, and December 5, 2014).  *Id.* at 4-5.  "In a securities fraud action, the court may take judicial
     notice of public records outside the pleadings, including SEC filings."  *In re Nuko Info. Sys., Inc.*
25   *Sec. Litig.*, 199 F.R.D. 338, 341 (N.D. Cal. 2000) (citation omitted).  Accordingly, the Court takes
     judicial notice of Exhibits A-W.   However, the Court will not take judicial notice of Exhibit X
26   because it is irrelevant to the disposition of this case.

27          [4] Plaintiffs assert that EA planned to release only eleven games.  Pl.'s Opp. to Mot. to
     Dismiss ("Pls.' Opp.") at 8 n.11.  However, EA planned to release an additional fifteen titles for
28   mobile devices, and thus it appears that plaintiffs refer to the eleven *major* titles that EA planned
     to release.  *See* Defs.' SRJN Ex. B, at 6.

United States District Court
Northern District of California

1    Similarly, a January 2013 report noted that "[w]ith a portfolio of strong franchises and key

2    upcoming catalysts that include next-gen consoles and *Battlefield 4*, we anticipate strong

3    profitable growth for [EA] in [fiscal year] 2014." *Id.* ¶ 41.

4            Key to BF4's importance was its role in facilitating EA's transition to next-generation

5    gaming consoles. *Id.* ¶¶ 42, 63.  On May 21, 2013, EA confirmed that BF4 would be available on

6    two next-generation gaming consoles, Sony PlayStation 4 and Microsoft Xbox One, as soon as

7    those consoles became available. *Id.* ¶ 71.  However, EA investors were skeptical about EA's

8    ability to launch BF4 without significant problems in light of EA's history of "disastrous" game-

9    launch and console-transition failures. *Id.* ¶¶ 45, 63.

10

11   **II.    BF4's Launch**

12           Before its official launch, BF4 received positive reviews during EA's live demonstrations

13   at video gaming conferences. *Id.* ¶ 74.  For example, on March 26, 2013, one reviewer "lauded"

14   EA's live demonstration of BF4 and characterized BF4 as "so important that it could make a

15   difference for EA's valuation in the stock market."  *Id.* ¶ 60.   In June 2013, EA's live

16   demonstration of BF4 on Microsoft's Xbox One next-generation gaming console at the Electronic

17   Entertainment Expo ("E3") received twenty-one awards. *Id.* ¶ 74.  On July 23, 2013, defendant

18   Moore confirmed that preorders for BF4 had exceeded those for the game's prior iteration. *Id.* ¶

19   75.

20           EA officially launched BF4 in a series of three rollouts: (1) BF4 launched on three existing

21   gaming consoles on October 29, 2013 (ACC ¶ 15); (2) BF4 launched on Sony's PlayStation 4

22   next-generation gaming console on November 15, 2013 (*Id.* ¶ 16); and (3) BF4 launched on

23   Microsoft's Xbox One next-generation gaming console on November 22, 2013 (*Id.* ¶ 97).

24           BF4's launch was met by a deluge of customer complaints regarding game-breaking

25   issues.  *Id.* ¶¶ 90-91.   On or about October 29, 2013, customers complained about BF4's

26   performance on existing consoles, stating that the "[g]ame won't even start" and "[t]he random

27   freezing/crashing is making [BF4] unplayable." *Id.* ¶ 90.  On October 30, 2013, one game

28   reviewer, who had early access to the next-generation version of BF4, published a review in which

United States District Court
Northern District of California

1    he described a "game-crashing" error.  *Id.* ¶ 88.  Similarly, after the next-generation launches on

2    November 15, 2013 and November 22, 2013, customers described multiple defects.  *Id.*  ¶¶ 94-97.

3    For instance, customers complained that "I can't play at all" and noted "[l]ots of crashes when

4    trying to load the game."  *Id.* ¶ 94.  On December 4, 2013, a reporter stated that he found it "hard

5    to believe that the issues facing *Battlefield 4* were a surprise to EA and DICE."  *Id.* ¶ 106.

6         In response, on December 4, 2013, EA announced that DICE would cease development on

7    any future projects until it had fixed BF4's defects, which took approximately three months.  *Id.*

8    ¶¶ 103, 114.  On December 10, 2013, DICE publicly released its "*Battlefield 4* Top Issues

9    Tracker," which listed BF4's defects as of that day.  *Id.* ¶¶ 109-110.

10        Beginning in Fall 2013, EA employees discussed some of the challenges facing BF4's

11   development.  In a November 6, 2013 email, a DICE developer who worked on BF4 explained

12   that EA "always wants more and more in the game until the very end of the project which puts an

13   enormous strain on QA to test everything. . . . We do test EVERYTHING we really do. . . ."  *Id.*

14   ¶ 92; Defs.' SRJN Ex I, at 2.  He also indicated that testing for defects took a long time and

15   suggested that DICE might not test BF4 after every programming update.  Defs.' SRJN Ex I, at 2.

16   On December 20, 2013, another BF4 game developer provided further details of the development

17   challenges.  ACC ¶ 111.  The employee noted that EA wanted to "squeez[e] out the maximum

18   capacity" of the next-generation gaming consoles by allowing code to run on multiple processors,

19   instead of the past practice of running code on a single processor.  Defs.' SRJN Ex. J, at 2.  The

20   new development technique made the code "timing-dependent," which created a risk that the game

21   might crash.  *Id.* at 3.  The employee acknowledged that DICE tested the game on largely similar

22   machines, which made it difficult to account for variances in timing.  *Id.* at 2-3.  Although DICE

23   was "not prepared for all the issues with [BF4]," the employee stated that "no one [at] EA or

24   DICE has ever said 'F*ck [sic] it, let's release it anyway.'"  *Id.* at 3.

25        On June 20, 2014, defendant Wilson discussed BF4's problematic launch during an

26   interview with *Eurogamer* magazine.  *Id.* ¶ 117.  Wilson denied that DICE had insufficient time to

27   test the game prior to launch, and instead pointed to the challenges of developing a game for the

28   launch of a next-generation gaming console.  Defs.' SRJN Ex. P, at 3.  Wilson explained, "Not to

United States District Court
Northern District of California

4

1    abdicate responsibility whatsoever . . . but when you are building a game on an unfinished

2    platform with unfinished software, there are some things that can't get done until the very last

3    minute because the platform wasn't ready to get done." *Id.*; ACC ¶ 117.

4

5    **III.    Purported Misstatements**

6          The Amended Complaint alleges that during the class period, defendants Gibeau, Moore,

7    and Wilson made the following five[5] materially false or misleading statements:

8

9          (1) During a May 7, 2013 earnings conference call with analysts and
             investors, defendant Gibeau responded to a question about EA's
10           prior gaming console transitions by stating: ". . . in comparison to
             last transition, we're in a much better state as a company in terms of
             our development. . . . [O]ur investment in Frostbite and EA
11           SPORTS over the last year has really put us in a position where the
             technology side or the engine side of this transition has largely been
12           de-risked." ACC ¶ 64, 66.

13          (2) During a June 12, 2013 investor breakfast, defendant Moore
             responded to a question about EA's prior gaming console transitions
14           by stating: ". . . we learned from [the last transition], and for this
             cycle, we have started early on Ignite and on Frostbite 3, and derisk
15           [sic] the technology engine component of making the transition. So
             from the standpoint of picking the wrong platforms, I think we did a
16           good job there but we've mismanaged the technology. That's not
             happening this time around." *Id.* ¶ 73.[6]
17
             (3) In an interview published on July 23, 2013, defendant Gibeau
18           responded to a question about Frostbite by stating: "We created two
             technology paths [Frostbite and Ignite] and invested early and got
19           them to the point where we were able to ship games on them. We
             weren't fighting the engines as we were developing. . . . [W]e
20           wanted to de-risk the technology piece as much as possible. That
             was the key learning. . . . I was not going to repeat that mistake. . . .
21           Frostbite has been the core difference. . . . [I]it makes for efficient
             and low-risk development." *Id.* ¶¶ 76-77.
22
             (4) During an October 29, 2013 earnings conference call, defendant
23           Wilson responded to a question about the impact of next-generation
             gaming consoles on EA's vision for the future by stating: ". . .
24           coming out of the last transition, we were resolute in our desire to

25
             ───────────────
26          [5]  The Court previously held these five purported misstatements, in addition to three others
        that have been omitted from the Amended Complaint, inactionable as a matter of law. *See* First
27      Dismissal Order, Dkt. No. 45, at 5-6.

28          [6]  The transcript of the investor breakfast attributes this statement to defendant Gibeau,
        rather than Moore.  Defs.' SRJN Ex. C, at 11-12.

5

United States District Court
Northern District of California

1

2

3

ensure we didn't have that kind of challenge again.  So as we approach this transition, I would say we started work earlier than we ever had done before, and we worked more closely with both Microsoft and Sony throughout the entire process, and the end result is, we have a launch slate of games that are the best transition games that I've ever seen come out of this Company. . . ." *Id.* ¶¶ 84-85.

4

5

6

7

8

(5) During the same October 29, 2013 earnings conference call, defendant Wilson responded to a question about the impact of next-generation gaming consoles on upcoming EA games by stating: "[W]hen you look at the success of a console generation, it's the combination of two things.  Great consoles and great software.  And as I talked about earlier, I think that our launch software this time is head and shoulders above where we were last time . . . .  [W]e are certainly bullish as we come into this platform generation, particularly as well as we have executed." *Id.* ¶¶ 84, 86.

9

The Amended Complaint alleges that the May 7, 2013, June 12, 2013, and July 23, 2013

10

statements "perpetuat[ed] the false impression that EA had successfully addressed the issues that

11

plagued the launch of games like *Medal of Honor, The Simpson* and *SimCity* by de-risking [BF4's]

12

development platform." *Id.* ¶ 82.  In fact, according to the Amended Complaint, "neither [BF4]

13

nor its technology platform Frostbite 3 were de-risked, largely or at all, and . . . the game's

14

development was high, not low, risk." *Id.*  The Amended Complaint further alleges that the

15

October 29, 2013 statements created the false impression that "EA's close work with Microsoft

16

and Sony had ensured the success of [BF4] and the Company's solid execution led to launch

17

software for [BF4] and other transition games [that were] ready for launch." *Id.* ¶ 89.  Plaintiffs

18

allege that defendants were aware of the numerous complaints detailing game-crashing defects,

19

which customers posted to online forums in the hours between BF4's launch and the defendants'

20

October 29th statements.  *Id.*  Plaintiffs also allege that the common use of Frostbite 3 for all

21

platforms made the defects certain to occur in the launch of the next-generation games.  *Id.*

22

Further, the Amended Complaint alleges that "EA's assurance that its close work with Microsoft

23

and Sony had led to the best transition games was shown to be false by the revelation that next-

24

generation build requirements took longer than expected to develop," and that the close work was

25

necessitated by the fact that the next-generation consoles were unfinished during BF4's

26

development. *Id.*  As to all statements, the Amended Complaint alleges that defendants "tacitly

27

admitted falsity" when they announced that DICE would focus exclusively on fixing BF4, that

28

industry analysts understood EA's announcement as an admission that EA was not surprised by

United States District Court
Northern District of California

1    BF4's defects, and that defendant Wilson admitted that the game had been unfinished at launch.

2    *Id.*

3         Defendants allegedly misrepresented facts about BF4 in order to drive BF4 pre-sales, beat

4    Activision's *Call of Duty* to market, and launch with the next-generation gaming consoles in time

5    for the holiday season.  *Id.* ¶¶ 6, 67, 92.  In a December 4, 2013 *Forbes* article, the article's author

6    stated, "I suspect that EA didn't want to hand victory over to Activision and *Call of Duty: Ghosts*

7    by delaying the game. . . ."  *Id.* ¶ 105.  Further, a November 6, 2013 email from a DICE developer

8    stated that "EA . . . wants us to release 2 weeks before [Activision's *Call of Duty*] to avoid

9    competition."  *Id.* ¶ 92.

10        In addition, defendants allegedly made these statements in order to sell their EA stock at

11   artificially inflated prices.  *Id.* ¶ 13-14.  The purported misstatements allegedly caused EA's stock

12   to trade at artificially high levels, reaching a class period high of $27.99 per share during the class

13   period.  *Id. ¶* 13.  After EA launched BF4 on the two next-generation gaming consoles, EA's stock

14   price dropped to $21.01 per share on December 5, 2013, thus removing the artificial inflation.  *Id.*

15   ¶¶ 20, 107, 135.  During the class period, defendants Wilson, Moore, and Gibeau sold 701,959

16   shares of EA stock for a total of $17,059,848.  *Id.* ¶ 119.  Individually, these defendants' class

17   period stock sales represented 74%, 74%, 85%, respectively, of their total individual EA stock

18   sold between January 1, 2008 and December 5, 2013.  ACC ¶ 122.

19

20   **IV.    Procedural Background**

21        In late 2013 and early 2014, plaintiffs instituted two actions against defendants:  *Kelly v.*

22   *Electronic Arts, Inc.*, No. 13-05837, and *Mastro v. Electronic Arts, Inc.*, No. 14-00188.  *See* Dkt.

23   No. 16.  By order dated January 22, 2014, the Court consolidated these actions.  *See* Dkt. No. 13.

24   On February 25, 2014, the Court designated Ryan Kelly and Louis Mastro as lead plaintiffs and

25   appointed lead class counsel.  *See* Dkt. No. 16.

26        On June 9, 2014, defendants filed a motion to dismiss plaintiffs' complaint under Federal

27   Rule of Civil Procedure 12(b)(6).  Dkt. No. 27.  This Court granted defendants' motion on

28   October 20, 2014, finding that the alleged misstatements were vague statements of corporate

United States District Court
Northern District of California

7

1    optimism that were inactionable as a matter of law.  Dkt. No. 45.  The Court granted plaintiffs

2    leave to amend their complaint to allege actionable misstatements.  *Id.*   Plaintiffs filed their

3    Amended Complaint on November 18, 2014.  Dkt. No. 49.  As stated above, the Amended

4    Complaint alleges no new misstatements, but instead presents additional facts purporting to

5    demonstrate that the alleged misstatements are in fact actionable. The significant additions are the

6    following:

> ✦ The Amended Complaint alleges that the term "de-risk," which
> forms the basis of a majority of the defendants' alleged
> misstatements, has a commonly understood meaning within the
> video game industry.  *Id.* ¶ 80.  Specifically, the complaint states
> that the term means "to make something safer by reducing the
> possibility that something bad will happen and that money will
> be lost."  *Id.* ¶ 80 n.10.  Plaintiffs point to a number of articles
> allegedly demonstrating a common understanding of the term
> within the video game industry.  *Id.* ¶ 80.
>
> ✦ The Amended Complaint provides details of EA's past game
> launches.  *The Simpsons*, released in 2012, suffered from
> technical issues that led EA to halt sales of the game for several
> months.  ACC ¶ 49.  The 2013 launch of *SimCity* saw
> Amazon.com pull the game from its website over technical
> issues.  *Id.* ¶ 52.  *Medal of Honor* was another 2013 game launch
> that was described as a "miss."  *Id.* ¶ 46.
>
> ✦ The Amended Complaint quotes from defendant Wilson's
> interview of June 20, 2014, in which he stated that EA could not
> get many things done until the last minute because "[EA was]
> building [BF4] on an unfinished platform with unfinished
> software . . . ."  *Id.* ¶ 117.  Plaintiffs describe this statement as an
> admission that Frostbite 3 was unfinished as EA developed BF4.
> *Id.* ¶ 2.

20   Presently before the Court is defendants' motion to dismiss the Amended Complaint.

22                               **LEGAL STANDARDS**

23   **I.     Federal Rule of Civil Procedure 12(b)(6)**

24   To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff

25   must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

26   *Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to

27   allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully."

28   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff must allege facts sufficient to "raise a

United States District Court
Northern District of California

United States District Court
Northern District of California

1   right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

2       In deciding whether a plaintiff has stated a claim upon which relief can be granted, the

3   Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences

4   in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

5   However, the court is not required to accept as true "allegations that contradict exhibits attached to

6   the Complaint or matters properly subject to judicial notice, or allegations that are merely

7   conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l*

8   *Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

9       If the court dismisses a complaint, it must then decide whether to grant leave to amend.

10  The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no

11  request to amend the pleading was made, unless it determines that the pleading could not possibly

12  be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)

13  (citations and internal quotation marks omitted).

14

15  **II.     The Securities Exchange Act of 1934**

16      Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or

17  employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive

18  device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as

19  necessary. . . ." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) by making it

20  unlawful to make any untrue statement of material fact necessary in order to make the statements

21  made not misleading. 17 C.F.R. § 240.10b-5.

22      A plaintiff asserting a claim under Section 10(b) or Rule 10b-5 must adequately allege six

23  elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

24  connection between the misrepresentation or omission and the purchase or sale of a security; (4)

25  reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

26  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citation

27  omitted); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).

28      The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a Section

10(b) complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009) (citation omitted). As to falsity, the complaint must state with particularity each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1); *In re Daou Sys.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citation omitted). As to scienter, the complaint must state with particularity facts giving rise to a strong inference that the defendant made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C. § 78u-4(b)(2); *In re Daou Sys.*, 411 F.3d at 1015.

Section 20(a) of the Securities Exchange Act of 1934 imposes liability on "control persons." 15 U.S.C. § 78t(a). To establish liability under Section 20(a), a plaintiff must first prove a primary violation of Section 10(b) or Rule 10b-5. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

## DISCUSSION

Defendants move to dismiss plaintiffs' Section 10(b) and Rule 10b-5 claim on the basis that the ACC violates the law of the case by alleging the same misstatements that this Court has previously held inactionable as a matter of law. Additionally, defendants renew their argument that plaintiffs have failed to state a fraud claim, and that the ACC fails to plead with particularity both falsity and scienter.[7] As to plaintiffs' Section 20(a) claim, defendants again move to dismiss on the ground that the complaint fails to adequately allege a primary violation under Section 10(b) or Rule 10b-5.

Because plaintiffs reallege the same statements that this Court previously held inactionable as a matter of law, the issue before the Court is whether plaintiffs' factual additions to their Amended Complaint demonstrate that the defendants' statements were sufficiently definite to be actionable, or otherwise pull the statements into the exception to the general rule that vague statements of corporate optimism are inactionable. For the reasons that follow, the Court finds

---

[7] Here, as in their prior motion to dismiss, defendants do not contest plaintiffs' allegations regarding certain other elements of a Section 10(b) claim, including loss causation.

United States District Court
Northern District of California

1    that the additional facts do not justify revision of the Court's prior determination.[8]

2

3    **I.       The Meaning of the Term "De-Risk"**

4              In its prior dismissal order, this Court held that the term "de-risk" is a non-actionable

5    vague expression of corporate optimism and puffery.  *See* First Dismissal Order, Dkt. No. 45, at

6    12.  In their Amended Complaint, plaintiffs provide additional facts purporting to demonstrate that

7    the word "de-risk" has a specific and commonly understood meaning, in this case associated with

8    the reduction of the risk of "deficiencies that caused technical problems with prior game

9    launches."  ACC ¶ 2.  The new allegations do not demonstrate such a precise meaning.

10             The definition plaintiffs provide adds no clarity to the term "de-risk."  The Amended

11   Complaint points to the Cambridge Dictionaries Online definition of the term:   "to make

12   something safer by reducing the possibility that something bad will happen and that money will be

13   lost."  ACC ¶ 80 n.10.[9]  The Court previously likened this term to the word "improved," which

14   also signifies making a product better or safer, and is a statement of corporate optimism and a

15   vague assessment of past results.  *See* First Dismissal Order at 12 (citing *In re Splash Tech.*

16   *Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (statement that product

17   line "improved" held inactionable as vague assessment of past results))

18             Further, the articles plaintiffs cite in support of their definition contradict the assertion that

19   the term "de-risk" has a precise meaning with regard to a reduction of the risk of technological

20   defects.  *See generally* Defs.' SRJN Ex. L (discussing ways to minimize risks to *investments* in

21   video game production); *id.* Ex. M (discussing the author's emphasis on taking "smart risks" by

22   reducing costs and taking a cautious approach to production); *id.* Ex. N (discussing how a video

23

24             [8]  Defendants argue that the law-of-the-case doctrine precludes reconsideration of the
     misstatements which the Court has already held inactionable.  Defs.' Mot. to Dismiss at 6-7.
25   Because the Court considers the allegations of the amended complaint as a whole, the Court finds
     it unnecessary to reach this question.

26
             [9]  In some instances, plaintiffs use the term to signify a reduction of risks.  At other times,
27   however, plaintiffs use the term to signify a complete elimination of risks.  *Compare* Pls.' Opp. at
     2 (stating that the term has a precise meaning of *alleviating* risks), *and id.* at 10 (disputing that
28   their allegations are premised on statements promising a problem-free launch), *with id.* at 14, 15
     (stating that defendants' message was that EA had *eliminated* risks associated with the transition).

United States District Court
Northern District of California

1    game production company reduces risks by minimizing costs); *id.* Ex. O (using the term "de-risk"

2    as distinct from the process of creating games).  The articles use the term "de-risk" in relation to

3    concepts such as cost, efficiency, and investments, but none uses the term in relation to

4    technological defects.

5    　　　Defendants' consistent use of "de-risk," when viewed in context, also demonstrates the

6    term's continued vagueness.  *See* ACC ¶¶ 64, 66; Defs.' SRJN Ex B, at 9, 15 (defendant Gibeau

7    using "de-risk" with reference to previous statements that Frostbite 3 reduces costs and promotes

8    efficiency); ACC ¶ 73, Defs.' SRJN Ex. C, at 11-12 (defendant Moore using the term "de-risk" in

9    response to an investor's question about the risks of gearing production toward particular

10   consoles); ACC ¶¶ 77-78; Defs.' SRJN Ex. F, at 3, 5 (defendant Gibeau using "risk" and "de-risk"

11   in discussions of early investments in Frostbite 3, reduced costs, and increased efficiency

12   associated with using a common technology engine across platforms).  No use of the term came in

13   the context of discussing the game-breaking glitches plaintiffs use to establish falsity, and two

14   uses came after explicit references to EA's SEC filings which made clear the risk of technological

15   glitches notwithstanding EA's quality controls.  Defs.' SRJN Ex. B, at 4; *id.* Ex. C, at 12; *id.* Ex.

16   Q, at 3; *id.* Ex. R, at 3.  Thus, instead of presenting Frostbite 3 as a panacea for technological

17   glitches, defendants used the term "de-risk" to signify reduced operating costs, increased

18   efficiency, and higher profit margins stemming from the use of a common technology engine

19   across current and next-generation platforms.  *See, e.g.*, Defs.' SRJN Ex. B, at 9 (Gibeau:

20   "[Frostbite 3 and Ignite] provide an enduring common technology that saves cost, fosters

21   efficiency, and provides spectacular physics and graphics for our games.").

22   　　　Thus, the allegations do not demonstrate that the term "de-risk" has any precise meaning.

23   Moreover, the inference that defendants used the term to promise the *elimination* of technological

24   risks is contradicted by the documents which plaintiffs incorporate into their complaint by

25   reference and is therefore entitled to no presumption of truth.  *See Daniels-Hall*, 629 F.3d at 998.

26   Given that plaintiffs rely on the materialization of technological defects to establish that the

27   defendants lacked basis for their "de-risking" statements, neither the added context nor the

28   previously alleged facts pull defendants' statements within the actionable exception to corporate

United States District Court
Northern District of California

12

1    puffery. *See Kaplan*, 49 F.3d at 1374 (9th Cir. 1994).[10]

2

3    **II.       EA's Past Game Launch Failures**

4             The Court also finds that plaintiffs' allegations regarding prior game launch failures do not

5    make any of the alleged misstatements actionable.  In their Amended Complaint, plaintiffs added

6    several paragraphs detailing the setbacks EA experienced with the past launches of three games:

7    *Medal of Honor*, *The Simpsons*, and *SimCity*.  *Id.* ¶¶ 46-56.  Plaintiffs allege that defendants'

8    statements that they had de-risked the transition technology created the false impression that they

9    had solved the issues that plagued these three games.  *Id.* ¶ 82.  Instead, plaintiffs allege, "[BF4's]

10   launch was plagued by the very defects and development shortfalls that defendants claimed were

11   cured by the de-risking that they assured investors would make [BF4's] launch different than

12   *Medal of Honor*, *The Simpsons* and *SimCity*."  *Id.*  According to plaintiffs, the occurrence of

13   serious defects in BF4 at launch demonstrates that defendants' statements about the improvement

14   in transition software were false.  Pls.' Opp. at 9; ACC ¶¶ 21, 68, 82.

15            As an initial matter, the Court notes that although the Amended Complaint adds more

16   detail regarding the "disastrous" prior game launches, the prior complaint alleged that "investors

17   were worried about the Company's history of disastrous game launches," that "[i]nvestors were

18   therefore concerned about EA's ability to successfully launch Battlefield 4, especially for next-

19   generation consoles," and that to address those concerns defendants stated that EA "had 'de-

20   risked' the technology problems that had caused past botched game launches."  Consol. Compl.

21   ¶¶ 3, 8-11.  The Court addressed these allegations in the prior dismissal order, and found that the

22   alleged misstatements, such as defendant Gibeau's May 7, 2013 statement that EA was in a "much

23   better state" for the next-generation transition and that Frostbite 3 had "largely been de-risked,"

24   and defendant Wilson's October 29, 2013 statement proclaiming that EA's launch software "[is]

25

26           [10]  This finding would not change even if the Court were to adopt the understanding of "de-
27   risk" as "minimizing the risks associated with the technological aspect of game development . . . ."
     ACC ¶ 80.  Indeed, the Court previously held the statements inactionable despite adopting that
28   view, that is, a representation that defendants "improved" upon past development platforms
     through minimizing associated technological risks.  *See* First Dismissal Order at 12.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    head and shoulders above where we were last time" were  non-actionable vague expression of

2    corporate optimism and puffery upon which no reasonable investor would rely.  First Dismissal

3    Order at 12, 13.  The additional context regarding the prior game launches does not change the

4    Court's analysis.

5            Further, each of defendants' statements dealt specifically with transition software, and

6    none of the three above-mentioned games is alleged to have been a transition game, or built on

7    transition software.  *See* Defs.' SRJN Ex. B, at 14-15 (defendant Gibeau making "de-risk"

8    statement in response to request for comparison of current and prior transition technology); *id.* Ex.

9    C, at 11-12 (defendant making "de-risk" statement in response to question about betting on certain

10   consoles in prior transition); *id.* Ex. F, at 3 (defendent Gibeau making "de-risk" statement in

11   response to question about prior transition platform);  *id.* Ex. H, at 9 (defendant Moore stating that

12   the next-generation games were the best *transition* games he had seen come from EA); *id.* at 15

13   (defendant Wilson stating that the next-generation software was head-and-shoulders above where

14   it was before the last transition).

15

16   **III.    Wilson's June 20, 2014 Interview**

17           The final significant factual additions to the plaintiffs' Amended Complaint are excerpts

18   from a June 20, 2014 interview with defendant Wilson.  In that interview, Wilson discussed BF4's

19   troubled launch, stating, "when you are building a game on an unfinished platform with unfinished

20   software, there are some things that can't get done until the very last minute because the platform

21   wasn't ready to get done."  ACC ¶ 117.

22           The parties dispute the meaning of Wilson's statement.  Plaintiffs describe the statement as

23   an admission that BF4 was built on an unfinished Frostbite 3 engine, which prevented EA from

24   adequately testing BF4 prior to launch.  ACC ¶¶ 2, 89.  According to plaintiffs, this admission

25   demonstrates that defendants' optimistic statements that the platform had been "de-risked" and

26   that the transition software was "head and shoulders" above prior transitions were unwarranted

27   and false when made.  *Id.*  Defendants, on the other hand, contend that Wilson's statement referred

28   only to next-generation platforms, not Frostbite 3.  Plaintiffs counter that their reading of Wilson's

1    statement is reasonable, and that the Court must therefore draw the inference in favor of plaintiffs,

2    that Wilson admitted that Frostbite 3 had been unfinished during BF4's development.

3         While the Court must ordinarily take the plaintiffs' allegations as true, the Court agrees

4    with the defendants that the context of the statement contradicts plaintiffs' assertions; accordingly,

5    the Court need not adopt the plaintiffs' view. *See Daniels-Hall*, 629 F.3d at 998.  ("[A court is

6    not] required to accept as true allegations that contradict exhibits . . . .").  The context of Wilson's

7    statements was in a larger discussion of how the challenges of building a game for next-generation

8    consoles, rather than insufficient testing, led to the difficulties BF4 experienced.  Defs.' SRJN Ex.

9    P, at 3 ("Wilson denied [that EA rushed to launch BF4], however, insisting that DICE had plenty

10   of time to work on the game, before pointing to the challenge of creating a next-gen console

11   launch title.").  Even without this context, Wilson's own statement about building BF4 on an

12   unfinished platform demonstrates that he was referring to next-generation consoles, not Frostbite

13   3: "*Not to abdicate responsibility . . . but* when you are building a game on an unfinished platform

14   with unfinished software, there are some things that can't get done until the very last minute

15   because the platform wasn't ready to get done."  *Id.* (emphasis added).   The disclaimer of

16   responsibility would be meaningless if Wilson were admitting that an unfinished Frostbite 3

17   engine had been responsible for BF4's problems.  Further, Frostbite 3 was not brought up in the

18   interview at all.  *See generally id.*  Thus, the Court does not adopt the view that Wilson's June 20,

19   2014 statement constituted an admission that Frostbite 3 was unfinished during the development

20   of BF4.  *See Daniels-Hall*, 629 F.3d at 998.[11]  Because this allegation does not demonstrate that

21   defendants lacked basis for their optimistic statements at the time those statements were made, the

22   Amended Complaint does not demonstrate that defendants' statements of corporate puffery are

23

24        [11]   Plaintiffs contend that, even if Wilson's comment referred exclusively to next-
     generation consoles, having spoken about EA's close work with Microsoft and Sony triggered a
25   duty for defendants to disclose that the consoles were unfinished. Pls.' Opp., at 11.  The Amended
     Complaint alleges no specific facts demonstrating that EA at any time concealed or
26   misrepresented the status of next-generation console development.  To the contrary, the only
     allegation plaintiffs have made on the point demonstrates that EA was in fact open about the
27   challenges presented by continued changes to next-generation consoles.  *See* Consol. Compl.,
     ¶¶ 78-80.  Plaintiffs have removed these allegations from their Amended Complaint and now
28   imply that such statements were never made. *See* Pls.' Opp. at 11.

United States District Court
Northern District of California

1    actionable.  *See Kaplan*, 49 F.3d 1363.

2         However, even if the Court drew the inference that defendant Wilson had in fact admitted

3    that Frostbite 3 had been unfinished, the result would be the same.  A later statement "may suggest

4    that a defendant had a contemporaneous knowledge of the falsity of his statement, if the later

5    statement directly contradicts or is inconsistent with the earlier statement."  *In re Read-Rite Corp.*

6    *Sec. Litig.*, 335 F.3d 943, 946 (9th Cir. 2003), *abrogated on other grounds as recognized in South*

7    *Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782-84 (9th Cir. 2008).   However, Wilson's

8    "admission" does not directly contradict any of the alleged misstatements.   Each statement

9    constituted a favorable comparison of EA's current position in relation to the company's position

10   ahead of the prior transition.  ACC ¶¶ 64, 66, 73, 76-77, 84-86.  The Amended Complaint lacks

11   any specific factual allegations related to prior transition games or technology, except for vague

12   references to prior "transition failures."  *See, e.g.*, ACC ¶ 22.  Thus, an admission that Frostbite 3

13   had not been finished until the last minute does not directly contradict statements that Frostbite 3

14   represented an improvement over EA's last transition software.  *See Read-Rite*, 335 F.3d at 946;

15   *see also Splash Tech. Holdings*, 160 F. Supp. 2d at 1077 (holding vague assessments of past

16   results inactionable).[12]

17        In sum, taking all of non-conclusory factual allegations in the Amended Complaint as true,

18   and drawing all reasonable and uncontradicted inferences in favor of the plaintiffs, the Court

19   continues to find that each of the defendants' statements represents an inactionable vague

20   statement of corporate puffery.  *See In re Apple Computer, Inc. Sec. Litig.*, 127 F. App'x 296, 304

21   (9th Cir. 2005) (holding "this is going to be the best Power Mac ever" inactionable as plausibly

22   held opinion and statement of corporate optimism); *In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-

23   1568 SBA, 2013 WL 1402788, at *13 (N.D. Cal Mar. 29, 2013) (holding statement that company

24   was "extremely well positioned" inactionable); *Splash Tech. Holdings*, 160 F. Supp. 2d at 1077

United States District Court
Northern District of California

_____

26        [12]  Nor would plaintiffs' reading of Wilson's statement contradict Gibeau's July 23, 2013 statement that EA developed Frostbite 3 to the point of being able to ship games on it.  *See* ACC

27   ¶ 77.  Gibeau's statement is exceedingly vague and does not refer to BF4 or any other particular game.  No facts in the Amended Complaint support the inference that EA could not ship *any*

28   games on Frostbite 3—even if the engine had been unfinished at the time Gibeau made this statement.

1   (holding statement that product line "improved" inactionable); *Stickrath v. Globalstar*, 527 F.

2   Supp. 2d 992, 998-99 (N.D. Cal. 2007) (statements touting "high quality" and "reliable" service

3   were non-actionable puffery that would not be likely to mislead a reasonable consumer).

4

5   **IV.   Falsity and Scienter**

6   Defendants again move to dismiss this action on the additional ground that the Amended

7   Complaint fails to plead with particularity that defendants made false or misleading statements

8   about BF4 intentionally or with deliberate recklessness.  In addition to the reasons stated above,

9   the Court agrees that the Amended Complaint fails to adequately allege falsity and scienter for the

10  reasons articulated by defendants.

11  Accordingly, the Court DISMISSES plaintiffs' Section 10(b) claims with prejudice.[13]

12

13  **CONCLUSION**

14  For the foregoing reasons, the Court GRANTS defendants' motion to dismiss the

15  Amended Consolidated Complaint with prejudice.

16

17  **IT IS SO ORDERED.**

18

Dated:  April 30, 2015

19                                          SUSAN ILLSTON
                                            United States District Judge
20

21

22

23

24

25      [13]  Defendants move to dismiss plaintiffs' claims for control person liability under Section
26  20(a) on the ground that the Amended Complaint fails to allege a primary violation under Section
    10(b) or Rule 10b-4. To establish liability under Section 20(a), a plaintiff must first prove a
27  violation of Section 10(b) or Rules 10b-5. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15
    (9th Cir. 2002).  As discussed above, plaintiffs have not adequately alleged a violation of Section
28  10(b) or Rule 10b-5. Accordingly, the Court GRANTS defendants' motion to dismiss the Section
    20(a) claim with prejudice.

United States District Court
Northern District of California